952 A.2d 594

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Robert COOK, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 5, 2006.

Decided July 24, 2008.

574

582

Jules Epstein, Kairys, Rudovsky, Messing & Feinberg, Philadelphia, for Robert Cook.

David R. Crowley, Centre County Public Defender's Office, for Pa. Assoc. of Criminal Defense Lawyers.

Amy Zapp, PA Office of Atty. Gen., Hugh J. Burns, Jr., Philadelphia District Attorney's Office, for Com.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Chief Justice CASTILLE.

The instant matter is before this Court on appellant's appeal from that part of the order of the Court of Common Pleas of Philadelphia County denying him a new trial pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. For the reasons that follow, we affirm the order below.

On November 15, 1988, a jury sitting before the Honorable Robert A. Latrone convicted appellant of first-degree murder, criminal conspiracy to commit murder, possessing an instrument of crime, and robbery. The convictions arose from the stabbing death of Alvin Tyler, from whom appellant had conspired with two cohorts to steal drug money and a videocassette recorder.[1] Subsequently, the same jury found three aggravating circumstances and no mitigating circumstances and, accordingly, sentenced appellant to death.[2] *See* 42 Pa. C.S. § 9711(c)(1)(iv) ("[T]he verdict must be a sentence of death if the jury finds at least one aggravating circumstance . . . and no mitigating circumstance. . . ."). On May 20, 1996, this Court affirmed appellant's convictions and judgment of sentence on direct appeal. *Commonwealth v. Cook*, 544 Pa. 361, 676 A.2d 639 (1996). The United States Supreme Court denied appellant's petition for a writ of *certiorari* on February 18, 1997. *Cook v. Pennsylvania*, 519 U.S. 1119, 117 S.Ct. 967, 136 L.Ed.2d 851 (1997).[3]

On October 27, 1997, appellant filed a timely *pro se* PCRA petition. Following the appointment of PCRA counsel, an amended petition was filed on March 11, 1999. The amended petition raised twenty-six claims for relief, including one alleging that "the Commonwealth exercised its peremptory jury strikes in both racially and sexually discriminatory manners." Amended PCRA Petition at 43 (emphasis omitted). In forwarding this claim, appellant noted that, in April of 1997, the Office of the District Attorney of Philadelphia released a videotaped training session on jury selection that Assistant District Attorney Jack McMahon had given to fellow assistant

1. The facts underlying appellant's convictions are set forth in detail in *Commonwealth v. Cook*, 544 Pa. 361, 676 A.2d 639 (1996).

2. The three aggravating circumstances that the jury found were: (1) appellant committed the killing while in the perpetration of a felony (*i.e.*, robbery), 42 Pa.C.S. § 9711(d)(6); (2) appellant had been convicted of another offense for which a sentence of life imprisonment or death was imposable, 42 Pa.C.S. § 9711(d)(10); and (3) appellant had been convicted of another murder, 42 Pa.C.S. § 9711(d)(11).

3. Appellant was represented by Vincent Lorusso, Esq., at trial, by David Belmont, Esq., on post-verdict motions, and by Ramy Djerassi, Esq., on direct appeal.

district attorneys in 1987.[4]   Appellant alleged in his petition that, on the videotape, Attorney McMahon describes various racial and gender stereotypes and suggests them as reasons for making peremptory challenges.[5]

After the Commonwealth filed a motion to dismiss the petition, on July 26, 2000, the PCRA court, per the Honorable Carolyn E. Temin, granted an evidentiary hearing on the following issues: (1) whether trial counsel was ineffective for failing to secure an expert medical witness to testify as to the victim's time of death; (2) whether trial counsel was ineffective for failing to develop and present mitigating evidence; and (3) whether the prosecutor committed misconduct by, *inter alia,* exhibiting racial bias in jury selection.   With one exception,[6] the PCRA court denied relief as to all issues raised by appellant in his PCRA petition.

■   Following several days of hearings held in December of 2002, the PCRA court denied appellant's petition on January 17, 2003.   After granting appellant's motion for reconsideration, however, the PCRA court vacated its order denying the petition.   The court granted appellant a new penalty hearing on March 13, 2003 and issued its Pa.R.A.P.1925(a)

4.   The Office released the videotape to attorneys of individuals, including appellant, whom Attorney McMahon personally had prosecuted before juries.

5.   This Court quoted extensively from the transcript of the videotaped lecture in *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 729–31 (2000), where the Court characterized the lecture as follows:

[T]he purpose of *voir dire,* namely, to select a fair and impartial jury, is denigrated as "ridiculous," in favor of the selection of jurors who will be biased in favor of conviction; various racial and gender stereotypes are described and offered as reasons to discriminate in the selection of jurors; techniques for accomplishing such discrimination are described in detail, including the maintenance of a running tally of the race of the venire panel and the invention of pretextual reasons for exercising peremptory challenges; and a willingness to deceive trial courts to manipulate jury panels to these ends is also expressed.

6.   The PCRA court held under advisement the issue of whether the trial court erred in refusing to give an instruction, pursuant to *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality), that life imprisonment in Pennsylvania means life without the possibility of parole.

opinion on June 12, 2003. The Commonwealth appealed from the grant of a new penalty hearing but later discontinued that appeal. Appellant's timely appeal from the denial of a new trial follows. In review of the PCRA court's decision to deny a new trial, our standard of review is limited to examining whether the court's findings of fact are supported by the record and whether its legal conclusions are free of error. *Commonwealth v. Sneed*, 587 Pa. 318, 899 A.2d 1067, 1071 n. 6 (2006).

## I. *Batson* Claim

Appellant first claims that Attorney McMahon, who was the trial prosecutor in this case, exercised peremptory challenges at appellant's trial based upon impermissible considerations of race and gender in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and its progeny. In forwarding his *Batson* claim, appellant makes a number of distinct arguments that require separate discussion. Appellant first argues that McMahon violated *Batson* and its progeny in three ways, namely: (1) by failing to provide a race-neutral reason for striking three particular black venirepersons; (2) by giving pretextual reasons for striking two other black venirepersons; and (3) by striking black mothers from the venire but neither white mothers nor black women with no children. In addition, appellant challenges two evidentiary rulings that the PCRA court made at the hearings it held on his *Batson* claim. In particular, appellant claims that the court erred in excluding: (1) comments that Philadelphia District Attorney Lynne Abraham made about the McMahon videotape at a news conference held at the time of its release; and (2) statistical evidence of McMahon's jury selection practices in other cases.

In *Batson*, the U.S. Supreme Court held that "the Equal Protection Clause forbids [a] prosecutor to challenge potential jurors solely on account of their race." *Id.* at 89, 106 S.Ct. 1712. We explained the framework for analyzing a *Batson* claim in our direct appeal opinion in *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033 (2002):

[F]irst, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712.

To establish a *prima facie* case of purposeful discrimination ... the defendant [must] show that he [i]s a member of a cognizable racial group, that the prosecutor exercised a peremptory challenge or challenges to remove from the venire members of the defendant's race; [7] and that other relevant circumstances combine [ ] to raise an inference that the prosecutor removed the juror(s) for racial reasons. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712....

The second prong of the *Batson* test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Rather, the issue at that stage " 'is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.* [ (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)) ].

If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test, *i.e.*, the ultimate determination of whether the opponent of the strike has carried his burden of proving purposeful discrimi-

7. In a case decided after *Batson*, the Supreme Court held that, while racial identity between the excluded juror(s) and the defendant might help to establish a *Batson* violation, it was not a necessary requirement. *Powers v. Ohio*, 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

nation. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. It is at this stage that the **persuasiveness** of the facially-neutral explanation proffered by the Commonwealth is relevant. *Id.*

*Harris,* 817 A.2d at 1042–43 (footnotes and some citations omitted).

██ " '[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal' and will not be overturned unless clearly erroneous." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting *Hernandez v. New York,* 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality)); *accord Wilson v. Beard,* 426 F.3d 653, 668 (3d Cir.2005). Such great deference is necessary "because a reviewing court, which analyzes only the transcripts from *voir dire,* is not as well positioned as the trial court is to make credibility determinations." *Miller–El,* 537 U.S. at 339, 123 S.Ct. 1029. "There will seldom be much evidence bearing on" the "decisive question" of "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Id.* (quoting *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859). "[T]he best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Id.* (quoting *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859) (internal quotation marks omitted); *accord Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712; *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067, 1076 (2006) (noting that "*Batson* contemplated a central role for the trial judge … in assessing the credibility of the neutral reasons for peremptory strikes proffered by the lawyer who exercised them"); *Commonwealth v. (Aaron) Jones,* 542 Pa.464, 668 A.2d 491, 520 (1995); *Riley v. Taylor,* 277 F.3d 261, 278 (3d Cir.2001) (noting that a trial judge's findings as to discriminatory intent are generally owed "even greater deference because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the

listener's understanding of and belief in what is said") (internal quotation marks omitted); *United States v. Casper*, 956 F.2d 416, 419 (3d Cir.1992).

The clear error standard of review is all the more appropriate on collateral review when the Commonwealth faces an even heavier burden of production given that many years have passed since *voir dire* was conducted. As the Third Circuit has explained, "in light of the passage of time ... it [i]s appropriate to lessen the burden of the Commonwealth" to explain its peremptory challenges in race-neutral terms. *Wilson v. Beard*, 426 F.3d 653, 668 (3d Cir.2005) (where twenty years had elapsed since trial).

■ To be eligible for post-conviction relief, appellant must show that the issues that he now raises have not been either previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). For purposes of the PCRA, "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial ... on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b). The word "issue" refers to the "discrete legal ground" entitling the petitioner to relief. *See Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 570 (2005); *Commonwealth v. Gwynn*, 943 A.2d 940, 944 (Pa.2008) (noting that, in *Collins*, we defined "issue" within meaning of Section 9543(a)(3)). While there may be multiple theories or allegations offered in support of a ground for relief, those theories or allegations are "simply a subset of the issue presented." *Collins*, 888 A.2d at 570.

Appellant first challenged Attorney McMahon's exercise of peremptory challenges by raising an objection at trial upon the conclusion of jury selection. *See* Notes of Testimony ("N.T."), 11/1/88, at 639. After stating on the record the race of each venireperson challenged by either the Commonwealth or the defense, the trial court considered appellant's claim and concluded that he failed to make a *prima facie* case of purposeful discrimination under *Batson*. *Id.* at 642. Following his conviction, appellant failed to raise the *Batson* claim either post-trial or on direct appeal. Appellant subsequently

sought to renew a *Batson* claim in his PCRA petition. Relying on *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717 (2000), the PCRA court granted an evidentiary hearing to develop the record with respect to appellant's *Batson* claim.

In *Basemore,* this Court first confronted the extent to which a PCRA petitioner may rely on the McMahon videotape to show purposeful discrimination under *Batson* in cases prosecuted by Attorney McMahon himself. *See Basemore,* 744 A.2d at 732–33. The *voir dire* preceding Basemore's trial occurred in April 1988, within a year of the recording of McMahon's lecture, sometime in 1987. Shortly after the release of the McMahon videotape in April 1997, Basemore first raised a *Batson* claim in the PCRA court by way of a supplemental post-conviction petition. The PCRA court refused to consider the videotape, deeming it irrelevant to Basemore's *Batson* claim. Basemore renewed his *Batson* claim before this Court, again relying on the McMahon videotape. The Commonwealth responded, *inter alia,* that the claim was waived due to Basemore's failure to raise it before the trial judge.

On appeal, this Court first noted that

> to the extent that the contents of the tape are otherwise admissible, they are, in fact, relevant, as they constitute direct evidence of the prosecutor's motivations at least at the time the tape was made, and may constitute circumstantial evidence of what occurred in the selection of the jury at Basemore's trial, which is alleged to have been conducted within the year following the training seminar.

*Basemore,* 744 A.2d at 732. Moreover, we declined to deem Basemore's *Batson* claim waived in light of "the highly unusual circumstances alleged, as well as the nature of the proof asserted." *Id.* at 733; *see also Commonwealth v. Lark,* 560 Pa. 487, 746 A.2d 585, 588 (2000) (declining to deem untimely under 42 Pa.C.S. § 9545(b)(1) second PCRA petition that relied in part on McMahon videotape and was filed within sixty days of tape's release). Instead, we remanded the matter for an evidentiary hearing to permit Basemore the

opportunity to develop a record concerning the *Batson* violation he asserted.

Instantly, in arguing that McMahon violated *Batson* by exercising peremptory challenges in a racially discriminatory manner, appellant does not explicitly rely to a substantial extent on the McMahon videotape. *See* Appellant's Brief at 32–39; *id.* at 32 n. 17 (asserting in one-sentence footnote that review of *Batson* claim "is proper here, as release of the videotape constituted after-discovered evidence not disclosed or discoverable at the time of appellant's trial or direct appeal"). Indeed, it is not altogether clear why appellant could not have made these same arguments on direct review. Nevertheless, unlike in *Basemore,* the Commonwealth does not assert, let alone argue, that appellant's various *Batson*-based arguments are waived due to his failure to raise them on direct appeal. Therefore, and given our recognition in *Basemore* that the McMahon videotape constitutes previously unavailable circumstantial evidence of McMahon's motivations during *voir dire* he conducted in the same general timeframe as the lecture recorded on the tape, we proceed to consider appellant's *Basemore*-based arguments on their merits.

In examining appellant's collateral *Batson* claim, the PCRA court noted that McMahon had used 74% (14 of 19) of his peremptory challenges against black venirepersons. The court further observed that McMahon struck 58% (14) of the 24 black venirepersons whom he had an opportunity to strike and 18% (5) of the white venirepersons he had an opportunity to strike.[8] "On the basis of this pattern of strikes and Attorney McMahon's comments on the training tape," the PCRA court "made a preliminary finding that defendant had established a *prima facie* case" of purposeful discrimination notwithstanding the trial court's finding to the contrary. PCRA Ct. Op. at 12; *see also* N.T., 12/11/02, at 15–16. The court then provided the Commonwealth the opportunity to

8. The PCRA court defined a venireperson whom the prosecutor had an opportunity to strike as "one who was not excused, struck for cause and not struck by the defense when it was the defense['s] turn to go first." PCRA Ct. Op. at 12 n. 3.

rebut appellant's *prima facie* case by presenting testimony from McMahon.

After reviewing McMahon's testimony with respect to each peremptory challenge to a black venireperson, the PCRA court found that the reasons he gave for ten of them were "credibly race neutral." PCRA Ct. Op. at 13–14. The court further noted that: 43% (24) of the 55 venirepersons were black; 50.9% (7) of the 12 jurors ultimately selected were black;[9] and both the defendant and the victim were black. Finally, the court stated that its "review of the record discloses no remarks by the prosecutor during *voir dire* that indicate that any of his strikes were racially motivated." *Id.* at 14. Accordingly, the court concluded that "[t]he defendant has failed to carry his burden of showing that the prosecutor exercised his peremptory challenges in a discriminatory manner." *Id.* Appellant now challenges the PCRA court's conclusion that he failed to prove purposeful discrimination.

Appellant first argues that Attorney McMahon's explanations for striking three black venirepersons amounted to merely a denial of a discriminatory motive and "general assertions" of his good faith. Citing *Bui v. Haley,* 321 F.3d 1304, 1317–18 (11th Cir.2003) and *Wilson v. Beard,* 426 F.3d 653 (3d Cir.2005), appellant asserts that two federal Courts of Appeals have considered similar explanations and held that they were insufficient to rebut the *Batson* challenger's *prima facie* case.

In response, the Commonwealth emphasizes that the PCRA court's finding that appellant failed to prove purposeful discrimination is entitled to great deference by this Court. The Commonwealth cites a multitude of circumstances supporting the PCRA court's determination, including, that: (1) the victim was black; (2) McMahon did not exhaust his available peremptory challenges even though the jury ultimately includ-

9. The Commonwealth asserts that it was established at the PCRA hearing that the jury actually consisted of eight blacks and four whites and that appellant did not dispute at the hearing that the trial court had erroneously identified a black juror as white. Our decision does not require a resolution of the discrepancy.

ed eight blacks; and (3) thirteen years after trial, McMahon still was able to provide credibly race-neutral reasons for most of his peremptory challenges. The Commonwealth observes that, because the trial court found that no *prima facie* case of purposeful discrimination was made, McMahon was not called upon to explain his peremptory challenges until thirteen years later. As for appellant's reliance on *Bui* and *Wilson,* the Commonwealth contends that these cases do not support appellant's position but, rather, confirm that the failure to provide a specific reason for every peremptory challenge does not establish a *Batson* violation on collateral review.

At the PCRA hearing held on December 11, 2002, Attorney McMahon testified as to the reasons he exercised peremptory challenges against each of the thirteen black venirepersons that he struck at trial. With respect to the three venirepersons that appellant now claims McMahon failed to provide race-neutral reasons for striking,[10] McMahon testified as follows:

[Commonwealth Peremptory # 15]: Again I can't—there's nothing that jumps out at me as to a reason I would have struck this individual other than again what I've talked about a few other of the jurors. This is not a very long voir dire either, very short voir dire and there's nothing that I can—that refreshes my recollection as to reason why I struck this individual. It obviously was something outside the cold record, how she answered, how she dressed, how she appeared, how she answered these questions is the only thing I can tell you.

[Commonwealth Peremptory # 7]:[I]t probably was intangibles in this particular case. I mean she was unemployed and had her child living at home and was unemployed, but generally unemployment wouldn't exclude you automatically. People could be unemployed for various reasons. I wouldn't say it was unemployed that may have been a factor coupled with some of the other intangibles again unemployment goes to stability, stability was something I looked for,

10. Because appellant generally asserts that McMahon's explanations were insufficient, we consider the three explanations jointly.

but I wouldn't say that's the sole reason here necessarily. I think it was probably the unemployment plus intangibles. [Commonwealth Peremptory # 10]:[F]or the life of me looking at this one I can't tell you why I used a peremptory challenge on her. Again the only thing I could tell you is that this could be—must have been intangible situation, must have been how she answered, clothing, book she read, something that told me that gave me some kind of vibe that this was not somebody because reading the cold record this is not somebody I would have usually exercised a peremptory challenge on. This is somebody I believe I would have accepted. Knowing myself and knowing what these answers say, this is somebody I believe I would have taken. So it must have been something else that I can't tell you right here because I can't see that person now and go through that again.

N.T., 12/11/02, at 48, 43–44, 45.

▆▆▆▆ Under *Batson*, to fulfill its obligation to rebut a *prima facie* case of discrimination in jury selection, the prosecution's explanation of its race-neutral reason must be "clear and reasonably specific," *Batson*, 476 U.S. at 98 n. 20, 106 S.Ct. 1712 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)), as well as "related to the particular **case** to be tried," *id.* at 98, 106 S.Ct. 1712 (emphasis added). *Batson*, of course, was speaking to circumstances where an objection was forwarded at trial, and thus, there was no time-lag impediment to recalling the reasons for a strike. In setting forth these requirements in a direct challenge context, the *Batson* Court "meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith." *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). In determining whether the prosecution has satisfied its burden of **producing** a race-neutral explanation for a peremptory challenge, it is important to remember that "the ultimate burden of **persuasion** regarding racial motivation rests with, and never shifts from, the opponent of the strike."

*Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (quoting *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769) (emphasis added). Thus, while a defendant can prove a *Batson* violation by showing that even one black juror was struck for a racial reason, *Harrison v. Ryan,* 909 F.2d 84, 88 (3d Cir.1990); *United States v. Battle,* 836 F.2d 1084, 1086 (8th Cir.1987); *United States v. David,* 803 F.2d 1567, 1571 (11th Cir.1986), a prosecutor's failure to explain every peremptory challenge of black jurors is not necessarily fatal to the prosecutor's burden of production, *Yee v. Duncan,* 463 F.3d 893, 900 (9th Cir.2006), *cert. denied,* —— U.S. ——, 128 S.Ct. 653, 169 L.Ed.2d 517 (2007); *Bui,* 321 F.3d at 1317; *David,* 803 F.2d at 1571; *United States v. Forbes,* 816 F.2d 1006, 1011 n. 7 (5th Cir.1987). Circumstantial evidence, in addition to the prosecutor's explanation, may be probative in the ultimate determination of whether peremptory challenges were made for racial reasons. Moreover, as we have noted above, the natural impediment arising from the delay attending collateral *Batson* claims is a factor.

The federal cases that appellant cites in arguing that the PCRA court erred in determining that appellant failed to prove purposeful discrimination undermine rather than support his position. In *Wilson,* the Third Circuit affirmed the District Court's conclusion that the defendant proved purposeful discrimination on the part of Attorney McMahon, who was also the lead prosecutor in that case.[11] Although the *Wilson* court based its conclusion in part on the McMahon videotape, it also considered relevant that every venireperson challenged peremptorily by McMahon, whose race was known, was black as well as McMahon's "equivocal statements to the District Court." *Wilson,* 426 F.3d at 670. Indeed, McMahon was equivocal when the District Court asked him whether race was ever a factor in his determining whom to challenge peremptorily. *See id.* at 668 n. 15. Moreover, at the evidentiary hearing

---

11. Notably, in affirming the District Court's grant of relief on Wilson's *Batson* claim, the Third Circuit explicitly applied the same clear error review applicable here in our review of the PCRA court's factual finding that appellant ultimately failed to prove purposeful discrimination. *See Wilson,* 426 F.3d at 668.

on Wilson's *Batson* claim, McMahon, with one exception, had "no idea" why he exercised peremptory challenges against the venirepersons whom he had stricken. *Wilson v. Beard*, 314 F.Supp.2d 434, 440 (E.D.Pa.2004). Similarly, in *United States v. Horsley*, 864 F.2d 1543 (11th Cir.1989), upon which appellant also relies, when asked by the trial court why he peremptorily challenged a black venireperson, the prosecutor merely responded, "I don't have any particular reason. I just got a feeling about him as I have about [several other members of the venire]." *Id.* at 1544 (internal quotation marks omitted).

In contrast, here, the PCRA court noted that McMahon offered specific explanations with respect to ten of the thirteen black venirepersons against whom he exercised peremptory challenges, and that the explanations were both credible and race-neutral. The PCRA court reviewed McMahon's testimony with respect to each stricken black venireperson. Its review accurately reflects that McMahon explained four peremptory challenges in terms of equivocation as to the death penalty, explained four other challenges in terms of the nature of the prospective jurors' employment or lack thereof, and noted that one black venirewoman stated that she was facing a crisis in her life and that another knew one of the witnesses in the case. PCRA Ct. Op. at 12–13. Therefore, appellant's reliance on *Wilson* and *Horsley*, in which the prosecutor conceded a complete inability to explain any of the peremptory challenges he exercised against black venirepersons, is unavailing.

Appellant also relies upon *Bui*, where the prosecution attempted to carry its burden of production by relying solely on the general explanation of the prosecutor's assistant, who was merely present for *voir dire*, that they "struck those who we believed would acquit. Those strikes were not based on race but on just our exercising our right to strike jurors [who] would be most favorable to acquit. On that grounds only." *Bui*, 321 F.3d at 1309. Unlike the Commonwealth here, the prosecution in *Bui* provided no explanation at all for striking any particular venireperson and offered no evidence whatsoever as to the state of mind of the prosecutor who actually

conducted *voir dire.* Accordingly, the Eleventh Circuit held that the trial court in *Bui* made an "unreasonable determination of the facts in light of the evidence contained in the record." *Id.* at 1317. As explained above, the non-explanation offered in *Bui* stands in stark contrast to the facts *sub judice,* where, notwithstanding the passage of time, McMahon was able to offer race-neutral explanations for most of the peremptory challenges that he exercised against black venirepersons, explanations that the PCRA court determined to be credible.

████ As for the legal principles upon which the trial court relied in finding that the defendant ultimately failed to carry his burden of persuasion in *Bui,* those principles were actually endorsed by the Eleventh Circuit in that case. In fact, the Eleventh Circuit noted that, in theory, circumstantial evidence in the prosecution's favor **could have** helped support the trial court's ultimate determination that the peremptory challenges were exercised for race-neutral reasons. For example, the Eleventh Circuit observed, if the record supported the trial court's determination that the prosecution provided a race-neutral explanation for most of its peremptory challenges, that would have been "the strongest circumstantial evidence" in its favor. *Id.* at 1318. In addition, the Eleventh Circuit noted that the fact that even a single African–American ultimately served on the jury is "a significant fact that may be considered as circumstantial evidence." *Id.; see also id.* (deeming "noteworthy" fact that neither defendant nor victims were black). We agree that the racial composition of the petit jury, the race of the victim or victims and of the defendant, and the number of peremptory challenges exercised against blacks that the prosecutor has credibly explained in race-neutral terms all serve as circumstantial evidence relevant to the ultimate determination of whether the defendant has carried his burden of persuasion under *Batson.*[12] This is particularly so where, as here, the Commonwealth is

---

12. Although this Court is not bound by the decisions of federal Courts of Appeals, we may look to them for guidance. *Commonwealth v. Ragan,* 560 Pa. 106, 743 A.2d 390, 396 (1999).

attempting to carry its burden of production thirteen years after jury selection.

Instantly, the PCRA court noted that McMahon offered specific explanations with respect to eleven of the fourteen black venirepersons against whom he exercised peremptory challenges, and that the explanations were both credible and race-neutral. In addition, the PCRA court cited all of the circumstances mentioned in *Bui* and noted that each one weighed against appellant and in favor of the Commonwealth on the ultimate question of purposeful discrimination. The PCRA court's inclusion of these factors in its *Batson* analysis was entirely reasonable. As for the PCRA court's weighing of these factors and of the credibility of McMahon's explanations, we see no error, especially given our necessarily deferential review standard.

Appellant next argues that the facially race-neutral explanations that Attorney McMahon provided for peremptorily challenging two black venirepersons were pretextual. Citing *Turner v. Marshall*, 121 F.3d 1248 (9th Cir.1997), appellant notes that McMahon struck two black members of the venire because they were unemployed but did not strike a white venireperson who was unemployed. In response, the Commonwealth argues that, although all three were unemployed, the two black members each had characteristics distinct from those of the white member such that McMahon's explanations for the two strikes were legitimate. The PCRA court did not specifically address appellant's pretext argument in its opinion.

At the *Batson* evidentiary hearing, McMahon explained his decisions to strike each of the two black unemployed venirepersons, respectively, as follows:

[Commonwealth Peremptory # 8]: This is a girl who at 24 again the stability factor was still living with her mother, her mother doesn't work and that she's a student, that again the stability factor. My question in looking at this juror is where is the money coming from? How are they surviving? How are they living a normal life if **she's a student** and not

working, **lives with her mother at 24,** the mother is not working? That to me rose the stability factor there.

[Commonwealth Peremptory # 17]:[T]he one that jumps out at me again is the unemployment factor, **but again not in and of itself.** This wasn't in my mind a criteria, but I do in looking at this voir dire **it appeared to me that he had been fired.** That was my reaction to it because he worked for PECO and he didn't retire from PECO and he was unemployed at the time right now and he was asked specifically did you retire from PECO, no. And I didn't go any further because I didn't want to embarrass the guy that he had been fired from PECO and that was my belief at that time, that he had been fired **and again that goes to the stability factor,** you know. That's not a factor, but he was a guy that appeared to be fired and you know there may have been some other reasons that as I've previously testified, but that was something that I—that concerned me as far as stability is concerned.

N.T., 12/11/02, at 44, 49 (emphasis added).

As McMahon explained elsewhere in his testimony at the *Batson* hearing, instability was one of the reasons that he struck prospective jurors and "unemployment goes to stability," but "unemployment wouldn't exclude you automatically. People could be unemployed for various reasons." *Id.* at 43. Here, both of the venirepersons whom McMahon struck revealed additional indications of instability other than just unemployment. Peremptory # 8 was, at twenty-four years old, a student who still lived with her mother; Peremptory # 17 appeared to have been fired from his previous job. In contrast, the white venireperson whom McMahon chose not to strike, who ultimately became Juror # 7, did not exhibit any additional indications of instability other than unemployment. During *voir dire,* other than stating her place of residence, her husband's unemployment status and previous occupation, and her daughter's occupation, Juror # 7 merely answered questions about her previous jury service and her ability to be fair and impartial and to vote for the death penalty if appropriate. *See* N.T., 10/19/88, at 135–37.

In light of the record, the Ninth Circuit's decision in *Turner* undermines rather than supports appellant's portrayal of Attorney McMahon's explanations for using Peremptories # 8 and # 17 as pretextual. As the only reason for striking a black venireperson, the prosecutor in *Turner* cited the venireperson's reluctance to view the type of gruesome photographs that would be shown in a homicide case. Because the prosecutor chose not to strike a white venireperson who exhibited even greater reluctance, the *Turner* court deemed the prosecutor's explanation pretextual. Importantly, the court was careful to emphasize that it was "not confront[ing] a case in which the prosecutor offered several explanations for a peremptory strike, and a seated juror shares **some** of the same characteristics cited as justifications." *Turner*, 121 F.3d at 1253. Indeed, the *Turner* court found the prosecutor's explanation pretextual specifically "[b]ecause the reluctance to view photographic evidence was the **only** reason actually proffered for [the venireperson]'s exclusion." *Id.* (emphasis added). Here, McMahon offered additional reasons for using Peremptories # 8 and # 17 other than their employment status, reasons inapplicable to the venireperson whom he accepted. Therefore, appellant's allegation of pretext lacks merit. *See Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1045 (2002) ("Appellant's comparison of jurors with select characteristics does not establish that the strike here, which was based upon a combination of reasons, was pretextual.").

Appellant next briefly argues that Attorney McMahon violated *Batson* by "striking black females with children who might relate to a black defendant" while declining to strike "similarly situated white women." Appellant's Brief at 36–37. Appellant provides a chart showing that McMahon struck the only two black mothers he had an opportunity to strike but did not strike any of the three black women without children or the three white women without children whom he could have stricken. *Id.* The Commonwealth responds that appellant fails to independently develop this claim and that, in any event, the record does not support it.

In addressing this argument, the PCRA court noted merely that appellant asserted that he was entitled to relief "because the prosecutor struck 69% of the black women he had an opportunity to strike." PCRA Ct. Op. at 14. After noting that appellant failed to develop this argument any further, the PCRA court concluded that it lacked merit. *Id.* In his Brief to this Court, appellant includes the above-mentioned information about specific venirepersons. Neither his PCRA petition nor his reply to the Commonwealth's motion to dismiss his petition, however, referred to any circumstances from *voir dire* other than the percentage of black women stricken that give rise to the inference that Attorney McMahon struck any particular black women based on their race and/or gender. *See* PCRA Petition at 67, ¶ 133; Reply at 3–9. Therefore, we agree with the PCRA court that appellant failed to establish a *prima facie* case of purposeful discrimination by striking black females with children.

Appellant next argues that the PCRA court erred when announcing its decision to deny PCRA relief on January 17, 2003. In particular, appellant asserts that "the PCRA court stated on the record that relief was denied on the jury selection claim because appellant had failed to establish even a *prima facie* case of discrimination (a position it has since reversed, *sub silentio,* in its Opinion)." Appellant's Brief at 37. In response, the Commonwealth argues that the PCRA court's ultimate conclusion on the third *Batson* element, that appellant failed to prove purposeful discrimination, renders immaterial its determination with respect to the first *Batson* element.

Under the burden-shifting framework of *Batson,* appellant was required to establish a *prima facie* case of purposeful discrimination in certain peremptory challenges made by the Commonwealth before the Commonwealth was required to provide race-neutral reasons for those challenges. Once the Commonwealth provided such reasons, the burden returned to appellant to dispute the persuasiveness of those reasons. In its Rule 1925(b) opinion explaining its denial of relief on appellant's *Batson* claim, the PCRA court stated that it "made

a preliminary finding that defendant had established a *prima facie* case." PCRA Ct. Op. at 12. The court then reviewed the testimony by Attorney McMahon that the Commonwealth used to rebut appellant's *prima facie* case. *See id.* at 12–13. After deeming McMahon's explanations both race-neutral and credible, the court concluded that "[t]he defendant has failed to carry the burden of showing that the prosecutor exercised his peremptory challenges in a discriminatory manner." *Id.* at 14. Therefore, it is clear that the PCRA court properly applied the burden-shifting framework of *Batson* and appellant's allegation of analytical error is meritless.

Appellant next argues that the PCRA court erred in excluding the admission of critical comments that District Attorney Lynne Abraham made about the McMahon tape at a news conference held at the time of its release. According to appellant, the District Attorney's comments were admissible pursuant to the party admission exception to the hearsay rule.[13] The Commonwealth responds that the District Attorney is not a party, that her comments do not constitute an admission, and that, in any event, they are not relevant to Attorney McMahon's individual state of mind during *voir dire* in this case.

In his Brief to this Court, appellant cites the following two excerpts from newspaper articles published shortly after the District Attorney's release of the McMahon tape:

> At a news conference Thursday, Abraham vehemently denied using the tapes as a political tool, saying she was "ethically, morally and legally" compelled to release the information "on a former prosecutor who advocated selecting jurors on the basis of race, seeking unfair panels and lying about the process."

> At a news conference today, Ms. Abraham said some convictions might merit judicial reviews in light of what she called the "outrageous" training tape. "That tape shows a prose-

13. A statement that would otherwise be considered hearsay is admissible if it was made by a party and is offered against that party by its opponent. Pa.R.E. 803(25).

cutor who advocated lying to the court and discriminating on the grounds of race," Ms. Abraham said.

Appellant's Brief at 9–10 n. 6 (quoting articles appearing in *Washington Post* and in *New York Times* in April of 1997).[14]

█ Pennsylvania Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. Building upon this definition, Rule 402 provides, in full, as follows: "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Thus, while the general rule of the admissibility of relevant evidence is subject to various exceptions, the rule that irrelevant evidence is not admissible is categorical. Accordingly, "[t]he threshold inquiry with admission of evidence is whether the evidence is relevant." *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 577 (2005); *Commonwealth v. Treiber,* 582 Pa. 646, 874 A.2d 26, 32 (2005); *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344, 350 (1998).

█ Appellant correctly identifies as the central fact material to his *Batson* claim whether Attorney McMahon had a discriminatory intent when exercising his peremptory challenges against African–Americans during *voir dire* in this trial, which took place in 1988. Appellant, however, fails to explain how the District Attorney's opinion on the subject matter of the tape makes any more or less probable the possibility that McMahon struck any particular venireperson on account of race at appellant's trial. Appellant does not allege that the District Attorney, who did not even assume that office until more than two years after appellant's trial, participated in any way in the Commonwealth's case against him. Regardless of her evaluation of the training tape, there is simply no reason to believe that the District Attorney herself was any more privy to McMahon's state of mind

14. At the time the McMahon tape was released, McMahon was running for election against Abraham for the office of District Attorney.

during *voir dire* at appellant's trial in 1988 than any other person who viewed the 1986 training tape.

Therefore, because the remarks were not relevant to any material fact at issue, the PCRA court did not err in excluding the District Attorney's out-of-court statements regarding her opinion of the McMahon tape. Consequently, we need not consider whether the party admission exception to the hearsay rule is applicable. Because it fails the threshold inquiry of admissibility, this basis for relief on appellant's *Batson* claim lacks merit.

In his final argument in support of his *Batson* claim, appellant baldly asserts that the PCRA court erred in ruling that statistical evidence of Attorney McMahon's allegedly discriminatory jury selection practices in other cases "was not necessary and then claiming that appellant had failed to prove a *prima facie* case." Appellant's Brief at 42. Although consisting of a brief paragraph in appellant's Brief, this argument is the focus of the *amicus curiae* brief submitted by the Pennsylvania Association of Criminal Defense Lawyers. The Commonwealth responds that the statistical study upon which appellant relies is both flawed as a matter of methodology and irrelevant to the issue *sub judice,* namely, whether McMahon exercised peremptory challenges on account of race during *voir dire* at appellant's trial.

As previously noted, in its Rule 1925(b) opinion explaining its denial of relief on appellant's *Batson* claim, the PCRA court stated that it "made a preliminary finding that defendant had established a *prima facie* case." PCRA Ct. Op. at 12. Therefore, appellant can only be heard to argue that the statistical study was admissible to prove purposeful discrimination on the part of Attorney McMahon "in the particular case." *Batson,* 476 U.S. at 98, 106 S.Ct. 1712. Instead, appellant asserts that the statistical study proffered by *amicus* was admissible "to establish a pattern and practice sufficient to prove an Equal Protection violation under *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) [15]

15. Until *Batson, Swain* required a defendant alleging race discrimination in jury selection to show that the prosecution engaged in a

" and "to sustain appellant's contention that a systematic pattern of exclusion of persons of color (as distinguished from the implementation of that practice in a particular case) stands as an independent violations [sic] of the Pennsylvania Constitution." Appellant's Brief at 42. Appellant, however, offers no such argument. As the PCRA court correctly concluded, "[e]ven if the defendant could demonstrate a pattern of discrimination in McMahon's cases, such a finding would simply be irrelevant to this case, because the prosecution has carried its burden of demonstrating that Attorney McMahon did not discriminate in jury selection in this case." PCRA Ct. Op. at 17. A majority of the jurors in this case were black, McMahon did not use all of his peremptory challenges, and the factfinder credited his explanations as to the prospective jurors he did strike. Appellant fails to explain how the statistical study would have helped prove purposeful discrimination in jury selection "in th[is] particular case." *Batson*, 476 U.S. at 98, 106 S.Ct. 1712. Therefore, this argument does not entitle appellant to relief on his *Batson* claim.

## II. Ineffectiveness Claims

Appellant next raises a series of claims of ineffective assistance of counsel. To merit relief based on an ineffectiveness claim under the PCRA, a petitioner must show that such ineffectiveness "in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). We have interpreted this standard to require a petitioner to prove that: (1) the underlying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) the ineffectiveness of counsel caused the petitioner prejudice. *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 233 (2006) (citing *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987)); *accord*

systematic pattern of exclusion, based on race, over a series of cases. *Swain*, 380 U.S. at 227, 85 S.Ct. 824. *Batson* expressly overruled *Swain* in this respect by allowing a defendant to establish a *prima facie* case of purposeful discrimination in his own case. *Id.* at 95, 106 S.Ct. 1712.

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[16] To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different. *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067, 1084 (2006) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding. *Id.* (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Moreover, "[t]his Court will not consider abstract allegations of ineffectiveness; a specific factual predicate must be identified to demonstrate how a different course of action by trial counsel would have better served [the petitioner]'s interest." *Commonwealth v. (Clifford) Smith,* 539 Pa.128, 650 A.2d 863, 867 (1994). A failure to satisfy any one of the three prongs of the test for ineffectiveness requires rejection of the claim. *Sneed,* 899 A.2d at 1076.

Because appellant was represented by new counsel on direct appeal, and his appeal was pending on collateral review prior to our decision in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), appellant's current ineffectiveness claims are only cognizable as "layered claims." *Grant,* 813 A.2d at 739 n. 16. Therefore, appellant must present argument on each of the three prongs of the *Pierce* test as to each relevant layer of attorney representation. *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1023 (2003). Accordingly, appellant argues, in a separate section of his Brief, that post-trial and direct appeal counsel were ineffective for failing to raise the ineffectiveness claims that he presents in his Brief to this Court. Specifically, appellant argues that "[i]t cannot be

16. Although Pennsylvania's *Pierce* test for ineffectiveness divides the performance element into separate prongs for arguable merit and reasonable basis, it does so only for ease of application. As this Court has repeatedly noted, the *Pierce* and *Strickland* standards themselves are coextensive. *See, e.g., Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 594 n. 8 (2007); *Commonwealth v. Hawkins,* 586 Pa. 366, 894 A.2d 716, 721 n. 10 (2006); *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822, 829 (2005); *Commonwealth v. Edmiston,* 578 Pa. 284, 851 A.2d 883, 890 (2004); *Commonwealth v. Busanet,* 572 Pa. 535, 817 A.2d 1060, 1066 nn. 10, 11 (2002).

found that prior counsel made a tactically reasonable decision to forego presentation of the claims raised on P.C.R.A.," claims that, if raised, appellant contends, would have warranted collateral relief. Appellant's Brief at 96–98. Appellant develops this argument by identifying "several issues that were not of even colorable merit" that direct appeal counsel argued on appeal while failing to raise the allegedly "substantial" issues now submitted to this Court. *Id.* at 97. Likewise, appellant identifies several issues "lacking in merit" that post-trial counsel raised to the trial court while "foregoing the substantial claims" now presented. *Id.* at 97–98. Therefore, because appellant has presented argument on each of the three prongs of the *Pierce* test as to post-trial and direct appeal counsel, we proceed to consider, with respect to each claim, the underlying question of whether trial counsel was ineffective.

### A. Failure to effectively cross-examine the medical examiner

▮ Appellant first claims that trial counsel was ineffective for failing to secure medical evidence available at the time of trial that conclusively disproved the Commonwealth's theory of the case. Specifically, appellant argues that trial counsel was ineffective for failing to ask Robert Catherman, M.D., the Philadelphia deputy medical examiner who conducted the autopsy on Alvin Tyler, the earliest time at which Tyler could have died. According to appellant, "Dr. Catherman, contacted for P.C.R.A. investigation, confirmed that the deceased was not killed at 1:30 or anytime near 1:30 a.m.," which, appellant deduces from the trial testimony of Commonwealth witness Sondee Harmon, was the approximate time of death. Appellant's Brief at 44.

In response, the Commonwealth asserts that appellant makes the two following false assumptions: (1) that trial counsel did not attempt to ascertain Tyler's time of death during his cross-examination of Dr. Catherman; and (2) that the Commonwealth's theory of the case depended on the exact time of Tyler's death. Consequently, the Commonwealth ar-

gues, trial counsel's decision not to press Dr. Catherman as to the exact time of death was reasonable and, in any event, did not prejudice appellant.[17]

The PCRA court denied relief on this claim, finding that appellant did not show that trial counsel's failure to press Dr. Catherman on the time of Tyler's death prejudiced appellant. The court reasoned that Dr. Catherman's testimony, even if it had been more specific as to the time of death, would not have been inconsistent with Harmon's testimony, which left a relatively wide window within which Tyler could have died.

During defense counsel's cross-examination of Dr. Catherman at trial, the following exchange occurred:

[Defense counsel]: Doctor, referring to the first page of your postmortem report, there is an indication in the third line in the blank where it says "date and hour of injury", you have 12–7–86 with a question mark after that. Could you explain that?

[Dr. Catherman]: That means that based on the available information and my examination of the body, that this death had occurred sometime on the 7th of December, 1986. The precise timing of that, whether before noon or after noon, was not established. There were some indications on the body that early postmortem changes had begun to occur. There were indications that this was, I guess in layman's terms, early decomposition change of some 24 hours or so prior to the time when the body was seen and examined. It

17. The Commonwealth argues, in the alternative, that appellant's ineffectiveness claim is waived because he abandoned it at the PCRA hearing. While acknowledging that appellant pleaded in his PCRA petition that trial counsel was ineffective for failing to ascertain the time of death, the Commonwealth argues that appellant waived this claim by focusing at the PCRA hearing on the related but distinct claim that trial counsel was ineffective for failing to retain his own medical expert. Although PCRA counsel's questioning of trial counsel does reflect some overlap in the former's development of the record with respect to these two issues, PCRA counsel did elicit testimony from trial counsel that is relevant to his failure to press Dr. Catherman on the exact time of death. See N.T., 12/13/02, at 30 (reflecting trial counsel's recollection that Dr. Catherman "couldn't be more precise with respect to minutes or even hours from 12:00 noon the following day or so"). Therefore, we conclude that appellant did not waive the instant claim.

is not possible, unfortunately, for me to be able to be more precise to say within minutes or even hours to determine whether it was before noon or after noon on December 7th that the death actually occurred.

[Defense counsel]: Thank you.

N.T., 11/3/88, at 979–80.

At the PCRA hearing held on December 17, 2002, the PCRA court accepted a stipulation to a statement of Dr. Catherman that PCRA counsel introduced in lieu of the doctor's testimony. *See* N.T., 12/17/02, at 5. In that statement, which is dated December 3, 1998, Dr. Catherman stated that he had reviewed the report of the autopsy that he conducted on Tyler's body on December 9, 1986, as well as the transcript of the testimony, quoted above, that he gave at trial on November 3, 1988. Dr. Catherman further stated that, after reviewing those documents, he had concluded as follows:

It is my opinion with reasonable medical certainty that [Tyler] died sometime after noon on December 7, 1986 but the possibility that it occurred shortly before noon that day does exist.

If I were asked in a hypothetical question if Mr. Tyler could have been seen alive on December 7, 1986 between 3:00 AM and 4:00 AM, I would respond that, based upon observation of his body and the facts presented, it would be my opinion that he was alive at that time.

PCRA Exhibit # D3.

Notably, the statement, which barely exceeds one page in length, neither attempts to explain nor even mentions Dr. Catherman's trial testimony that "[i]t is not possible ... to determine whether it was before noon or after noon on December 7th that the death actually occurred." Nor does the statement suggest how trial counsel was supposed to know that Dr. Catherman had changed his mind and opinion. More importantly, Dr. Catherman does not state that he would have testified that Tyler was most likely alive between 3:00 and 4:00 a.m. if defense counsel had pressed him at trial as to the exact time of death. Appellant nonetheless baldly asserts that trial

counsel's failure to challenge the doctor and pinpoint the exact time of death "led to the jury not hearing conclusive scientific evidence sustaining appellant's defense." Appellant's Brief at 43. In the absence of a specific factual predicate demonstrating how trial counsel's pressing Dr. Catherman as to the exact time of Tyler's death would have better served appellant's interest, appellant has failed to carry his burden of showing prejudice. *See (Clifford) Smith, supra.* Therefore, appellant is not entitled to relief on this ineffectiveness claim. *See Sneed, supra.*

## B. Irreconcilable conflict with trial counsel

Appellant next claims that he was denied effective assistance of counsel due to an allegedly "irreconcilable conflict" with trial counsel, Attorney Lorusso. Appellant's Brief at 46. Appellant bases this ineffectiveness claim on the trial court's failure to: (1) appoint new trial counsel; (2) conduct a meaningful hearing to examine the alleged conflict; and (3) appoint independent counsel to assist appellant in establishing the existence of the conflict.

As his first basis for relief on this claim, appellant asserts that Attorney Lorusso had an irreconcilable conflict with appellant during the trial because appellant had raised claims of Attorney Lorusso's ineffectiveness in representing appellant at his prior trial for another murder that was pending when the instant murder trial began. Appellant notes that on September 27, 1988, and again on October 31, 1988, he notified Judge Latrone, the judge who presided at appellant's trial, of his concerns with Attorney Lorusso's handling of and preparation for his defense. *See id.* at 47–48 (citing N.T., 9/27/88, at 21–25; N.T., 10/31/88, at 624–30). Appellant alleges that he requested that the court appoint new trial counsel on these occasions. In arguing that Judge Latrone erred in refusing to replace Attorney Lorusso, appellant relies upon *Commonwealth v. Tyler*, 468 Pa. 193, 360 A.2d 617 (1976), in which this Court held that the trial court had abused its discretion in refusing to appoint new counsel.

The Commonwealth counters that Judge Latrone addressed the concerns that appellant raised as to Attorney Lorusso's readiness for trial and that Attorney Lorusso assured the judge that he was prepared for trial. The Commonwealth further notes that in response to the concerns that appellant raised on September 27, 1988, Judge Latrone postponed the commencement of trial for three weeks. Finally, noting that appellant also moved to dismiss the charges on speedy trial grounds, demanded a waiver trial, and moved for recusal of Judge Latrone, the Commonwealth argues that appellant's request for new counsel "was just one of many tactics to avoid going to trial." Commonwealth's Brief at 47–50.

In denying relief on this claim, the PCRA court found that appellant "was unable to articulate any cogent reason for his dissatisfaction" with Attorney Lorusso, who assured the trial court that "he would be able to advocate zealously on the defendant's behalf." PCRA Ct. Op. at 6. Thus, the PCRA court determined that the trial court did not err in refusing to appoint new counsel given appellant's failure to show "irreconcilable differences ... which prevented him from cooperating with [Attorney Lorusso]." *Id.*

Pennsylvania Rule of Criminal Procedure 122(C) provides that "[a] motion for change of counsel by a defendant to whom counsel has been assigned shall not be granted except for substantial reasons." Pa.R.Crim.P. 122(C)(2). "To satisfy this standard, a defendant must demonstrate that he has an irreconcilable difference with counsel that precludes counsel from representing him." *Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139, 1150 (2000). Whether a motion for change of counsel should be granted is within the sound discretion of the trial court and will not be disturbed on appeal absent abuse of discretion. *Id.; Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861, 865 (1990). "While an indigent is entitled to free counsel, he is not entitled to free counsel of his own choosing." *Commonwealth v. Chumley*, 482 Pa. 626, 394 A.2d 497, 507 n. 3 (1978); *accord Commonwealth v. (James Lee) Smith*, 480 Pa. 524, 391 A.2d 1009, 1012 n. 3 (1978);

*Commonwealth v. Segers,* 460 Pa. 149, 331 A.2d 462, 465 (1975).

We first note that the notes of testimony from the pre-trial hearings that Judge Latrone held specifically to address appellant's concerns as to his representation do not reflect that appellant ever requested that the court replace Attorney Lorusso as trial counsel. Instead, the record reflects that at the September 27, 1988 hearing, appellant notified the court that he had "talked to Mr. LoRusso in reference to certain things pertaining to my case and he just doesn't know, you know, what's going on in this matter." N.T., 9/27/88, at 22. Judge Latrone then questioned Attorney Lorusso, who confirmed that, due to his involvement in another matter, he and appellant had not yet had an opportunity to discuss appellant's defense. Consequently, the court rescheduled jury selection for October 11th, thus allowing the defense two additional weeks to prepare for trial. Nevertheless, on the very eve of trial, appellant again voiced concerns to the court relating to Attorney Lorusso's readiness for trial. After hearing appellant's concerns, Judge Latrone twice asked Attorney Lorusso whether he was adequately prepared for trial. Both times, Attorney Lorusso responded in the affirmative. *See* N.T., 10/31/88, at 624, 631.

In light of the foregoing, appellant's reliance on *Commonwealth v. Tyler, supra,* is misplaced. In that case, Tyler alleged "an irreconcilable difference of opinion between himself and his court appointed counsel as to the manner in which the trial of his case should be conducted." *Tyler,* 360 A.2d at 618. Tyler moved for change of counsel, but the trial court denied the motion. On appeal, in holding that the trial court abused its discretion in denying the motion, this Court noted that Tyler's counsel actually agreed with Tyler that a difference of opinion existed between them as to how to conduct his defense. *Id.* at 619.

In contrast, the dispute here did not involve a difference over the defense. Moreover, the record *sub judice* reflects that Attorney Lorusso specifically denied appellant's assertions that he was unprepared to represent appellant

adequately at trial.. Where, as here, the defendant and his counsel offer competing contentions as to the readiness of defense counsel for trial, it is for the trial court to decide whose portrayal of defense counsel's degree of preparedness is more accurate. *See Spotz*, 756 A.2d at 1150 (finding no abuse of discretion by trial court in refusing to appoint new counsel where court "investigated the matter and was assured by appellant's counsel that they would be able to advocate zealously on appellant's behalf"); *Basemore*, 582 A.2d at 866 (finding no abuse of discretion by trial court in refusing to appoint new counsel where appellant "stat[ed] that the defense investigation was not complete" but defense counsel "related that he was prepared to go to trial").

In the instant case, after considering appellant's concerns as to Attorney Lorusso's readiness for trial, the court determined that the concerns were unjustified. Consequently, the trial court did not abuse its discretion in allowing the trial to proceed without a change in appointed defense counsel.

As his second basis for relief on the instant layered ineffectiveness claim, appellant argues that the trial court insufficiently explored his allegations of irreconcilable differences with Attorney Lorusso. Appellant contends that "the trial court did not hold a 'hearing' in which both counsel and Mr. Cook could air their views and respond to their respective claims." Appellant's Brief at 50. Appellant acknowledges that the trial court allowed him "a limited opportunity to air some of his concerns on the record." *Id.* Nevertheless, citing *United States v. Moore*, 159 F.3d 1154 (9th Cir.1998), appellant asserts that the trial court's hearing was inadequate because the court failed to consider all the factors relevant to the decision of whether to appoint new counsel, namely: the extent of the breakdown in the attorney-client relationship; how long a continuance would be needed to appoint new counsel; the inconvenience that would be caused by such a delay; and the degree to which any animosity between appellant and Attorney Lorusso prevented adequate preparation.[18]

18. Appellant concedes that the trial court did consider one relevant factor, namely, why appellant had not earlier requested new counsel.

The Commonwealth does not respond to this particular sub-argument.

In *Moore*, the U.S. Court of Appeals for the Ninth Circuit held that an irreconcilable conflict between the defendant and his counsel violated the defendant's Sixth Amendment right to effective assistance of counsel. In its opinion, the *Moore* court separately considered three factors that it deemed relevant to the determination, namely: (1) the extent of the conflict; (2) the adequacy of the court's inquiry into the conflict; and (3) the timeliness of the defendant's motion for new counsel. *Id.* at 1158–59. As for the first factor, the court found that "[i]n consistent, persistent representations to the court, Moore presented strong evidence of an irreconcilable conflict," *id.* at 1159, which was corroborated by testimony from Moore's counsel, *see id.* at 1160. This evidence included, *inter alia*, a "serious argument" between Moore and his counsel over his handling of Moore's defense, a belligerent threat by Moore to sue his counsel for malpractice, and testimony by Moore's counsel that he "felt physically threatened by Moore." *Id.* at 1159. It was only after finding in the record such strong evidence of an irreconcilable conflict that the *Moore* court proceeded to apply its three-factor test to examine the adequacy of the district court's inquiry into the conflict.

In contrast to the strong evidence of an irreconcilable conflict that the defendant presented in *Moore*, appellant, who is not a lawyer, merely voiced to the trial court his general misgivings about the extent of Attorney Lorusso's preparation for trial. Rather than confirming appellant's representations to the court, Attorney Lorusso stated on the record that "Mr. Cook and I have discussed the case and I really feel I am ready based on our discussions and the evidence at hand[.]" N.T., 10/31/88, at 631. Therefore, even if the Ninth Circuit's three-factor test to determine the adequacy of a trial court's inquiry into conflict with defense counsel were binding in this Commonwealth, we would conclude that Judge Latrone's inquiry was sufficient given the weakness of the evidence that appellant presented of a supposed irreconcilable conflict with

Attorney Lorusso arising from appellant's layman opinion as to Lorusso's state of preparation.

As his third and final basis for relief on the instant ineffectiveness claim, appellant briefly argues that the trial court erred in "fail[ing] to provide independent counsel at the conflict proceedings." Appellant's Brief at 51. Citing *United States v. Wadsworth*, 830 F.2d 1500 (9th Cir.1987), appellant contends that a hearing on a defendant's claim of an irreconcilable conflict with his counsel is a critical stage of trial proceedings to which the right to counsel attaches. The Commonwealth briefly responds that *Wadsworth* is distinguishable from the case *sub judice*.

In addition to the fact that it does not bind this Court, *Wadsworth* is readily distinguishable from the instant case. The Ninth Circuit determined in *Wadsworth* that "[u]nder the unusual circumstances of this case, the district court should have suspended the proceedings and appointed an attorney" to represent Wadsworth at the hearing on his motion for new counsel. *Id.* at 1511. Those "unusual circumstances" included Wadsworth's counsel's active and "antagonistic" opposition to the motion and his "admi[ssion] that he was bitter about his client's lack of confidence in him." *Id.* at 1510–11. The record *sub judice* does not reflect such level of hostility between appellant and Attorney Lorusso such that it would amount to the denial of effective assistance of counsel during the proceedings at which the trial court explored appellant's concerns with his representation. Accordingly, no relief is warranted on this claim.

### C. Failure to object to witnesses' references to appellant's prior "bad acts"

Appellant next claims that trial counsel was ineffective for failing to object to four instances of testimony that "regaled [the jury] with evidence of other crimes." Appellant's Brief at 52. Appellant argues that this testimony was particularly prejudicial in the absence of an instruction by the trial court

explaining the proper purpose for which the jury could consider such evidence.[19]

In response, the Commonwealth notes that defense counsel did, in fact, object to some of the testimony that appellant presently cites in forwarding this claim and that the trial court properly overruled those objections. Defense counsel, the Commonwealth argues, had a reasonable basis for not objecting, on the same grounds, to subsequent testimony, as the trial court would have overruled any such objections.

In denying relief on this claim, the PCRA court addressed two of the four instances of testimony to which appellant refers. Specifically, the court found that the testimony of Anna Serrano and of Darcyne Brown, *see infra,* was relevant to explain each woman's delay in reporting to the police her knowledge of appellant's involvement in Tyler's murder.

Pennsylvania Rule of Evidence 404 provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). Evidence of other bad acts may, however, be admitted if offered for another purpose, such as proof of motive, opportunity, intent, preparation, plan, or common scheme. Pa.R.E. 404(b)(2).

In advancing the instant claim, appellant first quotes testimony from his former girlfriend, Anna Serrano. Ms. Serrano testified that a few weeks after the murder of Alvin Tyler, appellant told her that he, Sondee Harmon, and Raul Serrano (Ms. Serrano's brother) had committed a robbery at Tyler's house and that "there was a struggle" among them. N.T., 11/2/88, at 897. When asked why she did not immediately report this information to the police, Ms. Serrano testified that appellant "had threatened me so many times, he had told me that if a woman ever jerked him, any woman, she would pay, and me specifically, that my brother would be the first to

19. Appellant does not claim that trial counsel was ineffective for failing to request such an instruction. Therefore, we confine our analysis to the issue that appellant presents, namely, whether trial counsel was ineffective for failing to object to the four instances of testimony to which appellant refers.

go." *Id.* at 899. When the prosecutor asked whether she believed him, Ms. Serrano responded: "Of course, I believed him. I seen what he had done before. I knew what he was capable of." *Id.* at 900. At this point, defense counsel objected and requested a mistrial, but the trial court allowed the testimony, reasoning at a sidebar conference that it was "relevant to why she was afraid of him." *Id.* Therefore, as trial counsel actually made the desired objection, the first instance of prior "bad acts" testimony does not support appellant's underlying ineffectiveness claim. Moreover, the evidence plainly was proffered for a purpose other than to show criminal propensity and, thus, was relevant.

The second excerpt of testimony upon which appellant relies is Raul Serrano's explanation for withholding his knowledge of appellant's involvement in Tyler's murder. Mr. Serrano testified that, on July 8, 1987, seven months after the murder and robbery, he described the crimes in a written statement to police. Serrano further testified that he had been "afraid to tell anybody" and believed that appellant "would do something to me." N.T., 11/3/88, at 1018. Serrano, however, did not testify to any prior actions whatsoever on the part of appellant that inspired his fear. Because it did not mention "other crimes, wrongs, or acts," Serrano's testimony does not implicate Rule 404 and, therefore, trial counsel was not ineffective for failing to object thereto on other crimes / criminal propensity grounds.

Appellant next cites testimony from Darcyne Brown in advancing the instant claim. Brown testified that she did not immediately report her knowledge of appellant's involvement in Tyler's murder because she was afraid of appellant. N.T., 11/4/88, at 1112. Brown further testified that she was afraid of appellant "because [of] the things that he used to do to his girlfriends, he used to hurt them pretty bad. I didn't want to be put in any chains [ ], so I just left it alone." *Id.* Again, this evidence was relevant to explain Brown's delay in relaying what she knew. Indeed, the day before Brown testified, the trial court had overruled an objection to Anna Serrano's references to appellant's prior threatening and vio-

lent behavior, reasoning that the testimony was "relevant to why she was afraid of him" and, in turn, to why she did not immediately implicate appellant in Tyler's murder. N.T., 11/2/88, at 900. As Brown's reference to appellant's violent behavior was relevant for the same reason, the trial court would properly have overruled an objection by trial counsel if it had been made.

Moreover, in subsequent testimony given the day before Brown testified, Ms. Serrano elaborated on the violent nature of her relationship with appellant. In particular, Ms. Serrano testified that appellant: (1) "throwed [her] down the stairs" more than once; (2) "put a gun to [her] head, and then asked [her] had [she] said [her] prayers lately"; (3) "pulled [her] arm out of place"; and (4) "swelled [her] a couple times," including one occasion on which he "swelled up [her] head" so severely that she sought treatment at a hospital. N.T., 11/3/88, at 949–50. In addition, when asked more generally whether she "knew [appellant] had no problem with physical violence towards women or [her]self," Ms. Serrano responded, "Absolutely." *Id.* at 950. Thus, when Brown made a passing reference on the stand to appellant's history of domestic violence, already fresh in the jury's mind were detailed accounts of the injuries that appellant allegedly inflicted as provided by the very person who endured them. These facts were directly relevant to explain why witnesses were initially reluctant to come forward.

Furthermore, even assuming the trial court would have sustained an objection to Brown's testimony had one been made, it is not reasonably probable that the jury ultimately would have reached a different verdict. This is especially true given the overwhelming evidence against appellant that the Commonwealth presented at trial. That evidence included the eyewitness testimony of two co-conspirators; the testimony of two other witnesses, including Anna Serrano, the mother of appellant's children, that he had bragged about committing the murder; Ms. Serrano's further testimony that, just weeks prior to the murder, the victim had made sexual advances to her and that appellant had responded casually by

telling her not to worry; and a glove identified at trial as belonging to appellant that was found underneath the victim's body. *See Commonwealth v. Cook*, 544 Pa. 361, 676 A.2d 639, 643–44 (1996) (reviewing sufficiency of evidence supporting appellant's conviction). Therefore, in light of all the foregoing, we find that appellant has failed to show that, had trial counsel objected to Brown's testimony referencing appellant's history of violent behavior, there is a reasonable probability appellant would not have been convicted. Having failed to demonstrate prejudice, appellant is not entitled to relief on his layered ineffectiveness claim based upon trial counsel's failure to object to the testimony of Darcyne Brown.

The fourth and final instance of trial testimony that appellant cites in forwarding his "bad acts" claim is that of his mother, Dorothy Cook. Defense counsel called Mrs. Cook to testify that Anna Serrano once told Mrs. Cook that she: (1) had lied when implicating appellant in Tyler's murder during her testimony at a preliminary hearing; and (2) immediately thereafter experienced an upset stomach to such an extent that she sought medical treatment. When Mrs. Cook testified that she and Ms. Serrano had discussed Ms. Serrano's preliminary hearing testimony, defense counsel asked Mrs. Cook what Ms. Serrano told her concerning that testimony. At that point, the prosecutor objected and a sidebar conference ensued. At the conference, the prosecutor warned defense counsel that he was opening the door to cross-examination as to whether Ms. Serrano had contacted Mrs. Cook complaining of an upset stomach after testifying against appellant on three separate occasions in two other cases in which appellant was charged with murder. After defense counsel voiced his concern as to the jury's learning that appellant had been charged with other murders, the trial court instructed that the prosecutor could cross-examine Mrs. Cook as he wished "as long as he does not earmark it as to any specific offenses." N.T., 11/9/88, at 1205.

Having resolved the issue at sidebar, the trial court permitted defense counsel to continue direct examination of Mrs. Cook, who testified that Ms. Serrano told her that she had lied

in testifying against appellant at the preliminary hearing. *Id.* at 1206. On cross-examination, the prosecutor asked Mrs. Cook whether she was aware that Ms. Serrano "got so sick and that this lie caused her such problems that she testified three times in three distinct and separate incidents after this great sickness came upon her?" *Id.* at 1217. Mrs. Cook attempted to answer when the prosecutor interrupted her and rephrased the question. *Id.* at 1218. At that point, defense counsel moved for a mistrial based on the prosecutor's reference to "three distinct" incidents, but the trial court overruled the objection. *Id.* at 1218. Thus, as defense counsel actually made the desired objection, the last instance of testimony upon which appellant relies does not support the instant layered ineffectiveness claim.[20] Appellant is therefore not entitled to relief on this claim.

### D. Failure to object to the Commonwealth's improper bolstering of Sondee Harmon[21]

Appellant next claims that trial counsel was ineffective for failing to object to the Commonwealth's improper bolstering of cooperating co-conspirator Sondee Harmon. Appellant alleges that the Commonwealth improperly bolstered Harmon by referring at trial to: (i) certain comments made by the Honorable Charles L. Durham while presiding over the hearing on Harmon's guilty plea for her role in the murder and robbery

[20] To the extent appellant would pose this issue as one sounding in appellate counsel's failure to pursue trial counsel's preserved claim, it fails because the prosecutor withdrew the question, there was no reference to any specific incident or other crime, and appellant has not shown the prejudicial effect of the reference.

[21] As part of this claim, which appellant styles generally as being based on "inadmissible evidence," Appellant's Brief at 55, appellant briefly argues that trial counsel was ineffective for failing to invoke the spousal privilege to preclude testimony from Anna Serrano. In response, the Commonwealth correctly notes that defense counsel did object at a preliminary hearing to Anna Serrano's taking the stand on grounds of spousal privilege. *See* N.T., 9/21/88, at 522 (reflecting defense counsel's statement that "it is our position that [Ms. Serrano] is the wife of Robert Cook and, therefore, not competent to testify in matters not involving her assault"). After careful consideration, the trial court overruled the objection. *See id.* at 544. Therefore, because defense counsel actually made the desired objection, appellant is not entitled to relief on this basis.

of Alvin Tyler; [22] and (ii) a prior statement about the crimes that Harmon had made to her attorney and that was consistent with her testimony at appellant's trial.

### i. *Judge Durham's comments*

During his cross-examination of Harmon at appellant's trial, defense counsel referred to the decision that Judge Durham made at her plea hearing to accept the Commonwealth's recommendation to set bail at $5,000. N.T., 11/2/88, at 843–44. On re-direct examination, ADA McMahon asked Harmon the following:

One other thing on that issue, on Page 66, that same judge said prior to that statement, "All right. You have no record and on the District Attorney's recommendation, and this is because I have a high regard for this District Attorney [*i.e.,* Attorney McMahon] and I know he has thoroughly investigated the case and found out your part in this, even though you are one of the participants, according to your statement, that you were not the main principle [sic] in this case." Did you understand that?

*Id.* at 844.

Appellant claims that defense counsel was ineffective for failing to object when Attorney McMahon read these comments into the record. Appellant argues that the comments "vouched for the 'veracity of' [Harmon] and the prosecutor." Appellant's Brief at 56. Appellant quotes *Commonwealth v. Miller,* 572 Pa. 623, 819 A.2d 504, 515 (2002), for the proposition that "the Commonwealth can reveal the existence and terms of a plea agreement, but cannot take any further action that would indicate to the jury that the prosecutor vouches for the testimony." Appellant's Brief at 56 (emphasis omitted).

The Commonwealth responds that defense counsel opened the door to the trial prosecutor's mention of the comments by suggesting when cross-examining Harmon that the plea agreement induced her to testify falsely against appellant. The Commonwealth contends that defense counsel chose certain

**22.** On February 10, 1988, Harmon pled guilty to third-degree murder and conspiracy before Judge Durham. *See* N.T., 11/2/88, at 844.

isolated excerpts of the notes of testimony from Harmon's plea hearing that were helpful to the defense. On re-direct examination, the Commonwealth argues, the prosecutor merely placed those excerpts in context by reading the omitted portions, including the statement of Judge Durham that is presently at issue.[23]

The PCRA court determined that appellant's claim based on Judge Durham's comments was meritless. After quoting the comments, the court found that they did not relate to Harmon's credibility and therefore denied relief.

In *Miller*, the Commonwealth presented the testimony of a co-defendant who previously had entered into a plea agreement pursuant to which he expected to avoid the death penalty in exchange for testifying against Miller. During his direct and re-direct examination of the co-defendant, the prosecutor repeatedly questioned him as to whether his plea agreement required him to testify truthfully. On appeal, Miller argued that the prosecutor thereby improperly bolstered the co-defendant's testimony. We disagreed, holding that

the Commonwealth can reveal the existence and terms of a plea agreement, but cannot take any further action that would indicate to the jury that the prosecutor vouches **for the testimony,** such as introducing the written plea agreement for the jury to peruse during deliberation ... or putting counsel for the co-conspirators on the stand to vouch **for the veracity of** their clients.... Moreover, the trial court must give an instruction to the jury cautioning them to look upon the testimony with disfavor and realize that

23. The Commonwealth also asserts that appellant's argument is a "hybrid claim" that "is different from either of the claims that [appellant] raised below and is, hence, waived." Commonwealth's Brief at 60. In his PCRA petition, however, appellant cited the very same portion of the notes of testimony that he cites in his Brief to this Court in which ADA McMahon read Judge Durham's comments into the record. Just as he now argues, appellant contended in his petition that "[t]his was a statement of opinion that was only for the purpose of bolstering the witness' [Harmon's] testimony." PCRA Petition at 35. Therefore, we find that appellant has properly preserved this argument for our review.

such witnesses may falsely blame others because of some corrupt and wicked motive.

*Miller,* 819 A.2d at 515 (emphasis added) (citations and internal quotation marks omitted). Accordingly, we rejected Miller's claim, reasoning that "the prosecutor's use of the word 'truthful' in his direct examination of [the co-defendant] [wa]s merely an articulation of the parameters of the plea agreement." *Id.*

As is clear from the plain words of his statement, Judge Durham neither vouched for Harmon's testimony against appellant, which was at that time only prospective in nature, nor vouched for the veracity of ADA McMahon. Rather, the comments that the trial prosecutor read into the record merely articulated Judge Durham's reasons for accepting the Commonwealth's recommendation to set Harmon's bail at $5,000 in the Commonwealth's separate case against her for third-degree murder and conspiracy.[24] Therefore, the Commonwealth did not improperly bolster the credibility of Sondee Harmon by reading Judge Durham's comments into the record. Because appellant's underlying allegation of error lacks arguable merit, defense counsel was not ineffective for failing to object to the comments.

### *ii. Harmon's prior statement to her attorney*

Appellant also argues that defense counsel was ineffective for failing to object when the prosecutor referred at trial to a prior statement about the murder and robbery of Alvin Tyler that Harmon had made to her attorney and that was consistent with her testimony at appellant's trial. Appellant briefly contends that the prosecutor's reference to the statement was improper because it occurred during direct examination—*i.e.,*

---

**24.** Although not necessary to our disposition of appellant's ineffectiveness claim, we further note that, in accordance with *Miller,* the trial court exhaustively instructed the jurors during its final charge as to the skepticism with which they should view Harmon's testimony. *See* N.T., 11/15/88, at 1405, 1406–07 (noting that Harmon's testimony "should be looked upon with disfavor because it comes from a corrupt and polluted source" and that whether Harmon bargained for prosecutorial leniency should be considered "as a factor of bias or self interest in determining whether or not to believe her testimony").

in anticipation of trial counsel's impeachment of Harmon—and because appellant "had no access to information to rebut the contention or critically examine the same." Appellant's Brief at 57.

In response, the Commonwealth notes that Harmon's testimony did not disclose the details of her prior statement. "Even if somehow improper," the Commonwealth adds, Harmon's "passing reference" on the stand to the prior statement did not prejudice appellant. Commonwealth's Brief at 61.

As previously stated, the PCRA court found that the Commonwealth did not improperly bolster Sondee Harmon. In its opinion, the court did not specifically address Harmon's prior statement to her attorney.

In concluding his direct examination of Harmon, during which she described the principal role that appellant played in Tyler's murder and robbery, the prosecutor asked her whether she had "discuss[ed] the incidents of December 6th and 7th" with the attorney handling her defense in the Commonwealth's case against her for her part in the crimes. N.T., 11/1/88, at 790. After Harmon answered in the affirmative, the direct examination of Harmon concluded as follows:

[Q]: Did you tell him everything that you told here today?

[A]: Yes, I did.

[Q]: That was just you and him?

[A]: Just the two of us.

[McMahon]: I have no other questions.

*Id.* at 791.

Pennsylvania Rule of Evidence 613(c) provides as follows:

(c) **Evidence of prior consistent statement of witness.** Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes if the opposing party is given an opportunity to cross-examine the witness about the statement, and the statement is offered to rebut an express or implied charge of:

(1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or

(2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation.

Pa.R.E. 613(c). Usually, evidence of a prior consistent statement may not be introduced until after the witness's testimony has been attacked on cross-examination in one of the two ways specified in Rule 613(c). Pa.R.E. 613(c) cmt. Occasionally, however, it is clear before cross-examination that the defense will focus on impeachment of the witness, either by showing fabrication, bias, *etc.*, or by introducing a prior inconsistent statement. In such cases, the trial court is afforded discretion to admit the prior consistent statement in anticipation of impeachment. *See Commonwealth v. Wilson*, 580 Pa. 439, 861 A.2d 919, 930 (2004).

This Court's decision in *Commonwealth v. (James Melvin) Smith*, 518 Pa.15, 540 A.2d 246 (1988), is instructive. In *Smith*, the appellant argued that the trial court erred in admitting, on direct examination, the prior consistent statement of Levi Rucker, a co-defendant who had agreed to testify against Smith under a plea agreement. Citing defense counsel's suggestion during opening argument that Rucker may have fabricated his testimony against appellant in order to obtain a more lenient sentence, we noted that "[Smith]'s entire line of defense centered around impeaching the credibility of the co-defendants." *Id.* at 258. Therefore, we held that the trial court was "well within [its] discretion" in allowing the prosecution "to introduce prior consistent statements to rebut a charge of corrupt motives in anticipation of the announced defense, rather than following cross-examination of this particular witness." *Id.*

It is even clearer in the instant case than in *Smith* that the trial court would have acted within its discretion in admitting a prior consistent statement in anticipation of impeachment. At a pre-trial hearing held just two weeks before

the direct examination of Sondee Harmon, defense counsel plainly stated to the court that "[t]he general defense that [he] gleaned from Mr. Cook in [his] discussions was that Sondee Harmon and [ ] Raul Serrano are not telling the truth." N.T., 10/17/88, at 6. Thus, from the beginning of trial, there was no doubt as to the general trial strategy of the defense. Moreover, trial counsel certainly knew, at the time he chose not to object, what his strategy was. Had defense counsel objected to the Commonwealth's reference to Harmon's prior statement to her attorney, the trial court would have been well within its discretion to overrule the objection in light of defense counsel's previously announced intention to portray appellant's co-defendants as falsely testifying against him in order to obtain a more lenient sentence. Ultimately, the claim boils down to an order of proof issue. There is no arguable merit to appellant's ineffectiveness claim based on defense counsel's failure to raise an objection to the Commonwealth's reference to Harmon's prior consistent statement. Because its underlying allegation of improper bolstering lacks arguable merit, the instant ineffectiveness claim necessarily fails. *See Sneed, supra.*

## E. Failure to object to jury instructions on adverse inference and reasonable doubt

Appellant next claims that trial counsel was ineffective for failing to object to certain portions of the trial court's jury instructions, namely: (i) the adverse inference charge that the trial court gave in its preliminary instructions; and (ii) the trial court's reasonable doubt instruction.

### i. *Adverse inference charge*

Appellant first claims that trial counsel was ineffective for failing to object when, during its preliminary instructions, the trial court referred to the defendant's right not to testify as his right "not to incriminate himself." Appellant's Brief at 58 (citing N.T., 11/1/88, at 659). Appellant argues that the trial court thereby "explicitly linked the silence of the accused at trial to the avoidance of revealing incriminating information."

*Id.* at 58–59. Appellant acknowledges *Commonwealth v. Stokes,* 532 Pa. 242, 615 A.2d 704 (1992) (Opinion Announcing the Judgment of the Court ("OAJC")), in which a similar claim was rejected. Nevertheless, appellant offers two reasons why *Stokes* should not control the instant case. First, appellant argues, *Stokes* is inapposite because too much time elapsed in the instant case between the court's initial adverse inference charge and the one that it gave during its final instructions, which appellant concedes was proper. Second, appellant contends, *Stokes* "used an incorrect analysis for reviewing jury charge constitutional error." Appellant's Brief at 59. Instead of focusing on the trial court's jury instructions as a whole, appellant submits, this Court should ask whether the trial court ever explicitly corrected its allegedly improper instruction. Citing *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) and *United States v. Hernandez,* 176 F.3d 719, 735 (3d Cir.1999), appellant argues that he is entitled to relief because trial counsel failed to draw the court's attention to the "contradictory" instructions that it had given with respect to his right not to testify.

In response, the Commonwealth argues that the trial court's initial adverse inference charge was a correct statement of the law. The Commonwealth specifically denies appellant's contention that the court's comment encouraged the jury to infer that his silence at trial meant that he was guilty. In any event, the Commonwealth notes, the trial court clarified any ambiguity on this point in its final charge to the jury.

The PCRA court denied relief on this claim. It rejected as "pure speculation" the notion that the trial court's "brief remark made prior to trial caused the jury to conclude that the defendant's decision not to testify meant that he was guilty." PCRA Ct. Op. at 6–7.

▆▆▆▆▆▆ "It is axiomatic that, in reviewing a challenged jury instruction, an appellate court must consider the entire charge as a whole, not merely isolated fragments, to ascertain whether the instruction fairly conveys the legal principles at issue." *Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d

1167, 1187 (1999). "An instruction will be upheld if it clearly, adequately and accurately reflects the law. The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law." *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1287 (2000) (citation omitted).

During its preliminary instructions, the trial court instructed the jury that:

as I have instructed you during the course of my voir dire instructions in terms of preliminary instructions, as a matter of law, the defendant has no obligation to offer evidence, bears no burden to introduce evidence and no risk of persuading you of the fact that he is innocent or not guilty by reason of the fact of the introduction of evidence. The defendant has a right to assert his rights not to incriminate himself and remain silent under the Fifth Amendment. Under the law, every defendant is presumed innocent and has the right to remain silent under the Fifth Amendment. The sole and only and exclusive burden is on the Commonwealth in this case to prove the defendant guilty beyond a reasonable doubt.

N.T., 11/1/88, at 659–60.

At trial, appellant chose not to take the stand in his own defense. Accordingly, during its final charge, the trial court instructed the jury, in pertinent part, as follows:

Furthermore, you must not presume, infer, conclude, or entertain any idea or inkling that the defendant is guilty of the charge for which he stands accused from the fact that he has not testified in his own behalf in this case. The defendant, under the Fifth Amendment, as I have instructed you several times heretofore, has a right to remain silent and not to testify.

N.T., 11/15/88, at 1378.

In *Stokes, supra,* the appellant claimed that his counsel was ineffective for failing to object to the trial court's reference to the defendant's "right not to incriminate himself" during its

instructions to the jury. The court's instructions were, in pertinent part, as follows:

> The defendant has a right to remain silent and not testify. You are not by the indirect mental process of assertion to his right to silence to conclude that he is in any respect guilty, done anything wrong, or is hiding anything by the assertion of his right not to incriminate himself and to remain silent and not to take the witness stand as a party defendant.

> Again, the defendant, as a person accused of the crime, is not required to present evidence or prove anything in his own defense.

*Stokes,* 615 A.2d at 709 (emphasis and internal quotation marks omitted). Much like appellant in the case *sub judice,* Stokes argued that the word "incriminate" "create[d] the impression in the minds of the jurors that had [Stokes] taken the stand his own testimony would have proven his involvement in the crimes charged." *Id.* In his OAJC, then-Justice (later Chief Justice) Cappy, writing for himself and two other Justices, acknowledged that the trial judge's phraseology was flawed and cautioned against its future use. *See id.* Nevertheless, the three Justices determined that the charge, as a whole, sufficiently and accurately apprised the jury of the defendant's right to remain silent. Refusing to review instructions "by focusing on one or two words taken out of the context within which they were spoken," the three Justices concluded that Stokes' trial counsel was not ineffective "for failing to object to the improper choice of a few words." *Id.*

In *Commonwealth v. Speight,* 578 Pa. 520, 854 A.2d 450 (2004), a majority of this Court relied on *Stokes* in rejecting a similar ineffectiveness claim. In *Speight,* the appellant argued that his trial counsel was ineffective for describing, during *voir dire,* the defendant's right not to testify as his "Fifth Amendment right against self-incrimination." *Id.* at 457. Much like appellant in the instant case, Speight argued that "equating the right to remain silent with the Fifth Amendment right against self-incrimination told the jury that [Speight]'s failure to testify would be because to do so would be incriminating."

*Id.* at 457–58 (internal quotation marks omitted). Noting that the trial judge clearly and accurately instructed the jury as to the defendant's right not to testify, we held that Speight failed to show that his counsel's use of the phrase "right against self-incrimination" resulted in prejudice and therefore rejected his ineffectiveness claim. *Id.* at 458–59.

Similarly, in the instant case, appellant has failed to show a reasonable probability that, had the trial court not made the one-time reference to appellant's right "not to incriminate himself," the jury would not have convicted him. Moreover, the challenged reference did not purport to narrow or restrict the Fifth Amendment right; rather, the initial adverse inference charge reads as if the defendant had a series of rights. Further, the initial charge appears in the context of the court's comprehensive and accurate explanation that the burden of proof always remained on the Commonwealth. Both in its initial adverse inference charge and in its final instructions, the court repeatedly and broadly referred to appellant's Fifth Amendment right as his right "not to testify" or "to remain silent."

Appellant's reliance upon *Francis, supra,* and *Hernandez, supra,* is misplaced. *Francis* involved an instruction that erroneously directed the jury to presume an essential element of the offense, *see Francis,* 471 U.S. at 315–16, 105 S.Ct. 1965, while the trial court in *Hernandez* instructed the jury that "[t]here is no specific definition" of reasonable doubt . . . [i]t's what you in your own heart and your own soul and your own spirit and your own judgment determine is proof beyond a reasonable doubt," *Hernandez,* 176 F.3d at 731 n. 5. In response to Francis' claim that the trial judge erred in giving the instruction, the government responded that another instruction that the judge subsequently gave cured the initial inaccuracy. *See Francis,* 471 U.S. at 319, 105 S.Ct. 1965. Rejecting this argument, the Court held that "[l]anguage that merely **contradicts** and does not explain a **constitutionally infirm** instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two **irreconcilable** instructions the jurors applied in reaching their

verdict." *Id.* at 322, 105 S.Ct. 1965 (emphasis added). The Third Circuit rejected the same argument in *Hernandez*, reasoning that, "when an **erroneous** instruction is given, a subsequent clarification must be sufficiently clear and compelling to allow a reviewing court to conclude that there was no reasonable likelihood that the initial **inaccuracy** affected the jury's deliberation." *Hernandez*, 176 F.3d at 731 (emphasis added).

In the instant case, the various phrases that the trial court used when referring to the defendant's Fifth Amendment right were neither contradictory nor irreconcilable. Although the phrase right "not to incriminate" is less charitable to the defendant than the right "not to testify" or the right "to remain silent," it is not erroneous, inaccurate, or constitutionally infirm. Therefore, *Francis* and *Hernandez* are inapposite here. Furthermore, we should not indulge the notion that jurors are so naïve that the reference could lead them astray.

Finally, the claim fails as one sounding in counsel ineffectiveness. Had counsel objected, the court could have addressed the point then and there, which would merely have highlighted what it in fact had already said—*i.e.,* that one component of the Fifth Amendment right is the right not to incriminate oneself. Even if counsel noticed the phraseology, he was not obliged to object to a charge that he could well believe caused no harm. Certainly, appellant has not offered to prove that counsel's conduct was objectively unreasonable. The PCRA court did not err in rejecting this ineffectiveness claim based on trial counsel's failure to object to the court's reference to appellant's right "not to incriminate" himself.

### ii. Reasonable doubt instruction

The other portion of the trial court's jury instructions upon which appellant bases his ineffectiveness claim is its instruction on reasonable doubt. Specifically, appellant objects to the court's definition of reasonable doubt as a doubt that would cause a reasonable person to "pause, hesitate, and restrain" himself before acting (or to "stop, hesitate, and seriously consider" whether he should act) rather than to

merely hesitate before acting. *See* Appellant's Brief at 61 (quoting N.T., 11/15/88, at 1382). Appellant argues that, unlike the word "hesitate," the words "stop" and "restrain" suggest that the action is not ultimately taken and thus denote a "much higher level of doubt than is allowed by due process." *Id.* at 63. Appellant argues that the trial court's instructions "explained reasonable doubt to the jury in a manner that diminished the Commonwealth's burden of proof." *Id.* at 61.

Appellant also objects to the court's description of a reasonable doubt as "much more serious" than a possible doubt. *See id.* (quoting N.T., 11/15/88, at 1383). Citing *Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), a case decided five years after the trial here, appellant argues that such language can only be used to distinguish reasonable doubt from a "conjured up" doubt. Appellant's Brief at 62.

The Commonwealth dismisses appellant's claim as "remarkably frivolous." Commonwealth's Brief at 62. Noting that this Court "has explicitly approved of instructions containing the word 'restrain' for nearly five decades," *id.* (quoting *Commonwealth v. Marshall,* 570 Pa. 545, 810 A.2d 1211, 1225 (2002) (OAJC)), the Commonwealth contends that the trial court's reasonable doubt instruction in the instant case was "entirely proper," *id.*

The PCRA court denied relief on this claim. In particular, it determined that the trial court's use of the words "stop and pause" and "retrain and seriously consider" "did not change the meaning of reasonable doubt and accurately conveyed the concept to the jury." PCRA Ct. Op. at 8.

During its final charge, the trial court instructed the jury on reasonable doubt as follows:

What is a reasonable doubt? Note initially that although the Commonwealth has the burden of proving that the defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all doubt and to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence.

A reasonable doubt is such a doubt as would cause a reasonably prudent, careful, and sensible person to **pause, hesitate, and restrain** himself or herself before acting upon a matter of the highest importance in his or her own affairs. A reasonable doubt is such a doubt as would cause a person to hesitate in arriving at a conclusion in a matter of importance to that person. . . .

A doubt to be reasonable must be one which fairly strikes a conscientious mind and clouds the judgment. It is not such a doubt as one might dig up, conjure up, or summon up out of nowhere for the purpose or purposes of escaping or avoiding the consequences of an unpleasant or unwanted verdict; but it is a doubt which is reasonable and honest, a real doubt arriving [sic] out of the evidence that was presented, or just as importantly, out of the lack, void or absence of evidence presented with respect to some element of the crime. . . .

A reasonable doubt such as would be taken notice of by a juror in deciding a case, or a question or issue in the case, is of the same nature as a doubt that would cause a reasonable man or woman, in the conduct of his or her own affairs in a matter of importance to himself or herself, to **stop, hesitate, and seriously consider** as to whether he or she should do a certain thing before finally acting.

Further, a reasonable doubt is something different and **much more serious** than a possible doubt. During the course of acquisition of worldly knowledge in our day-to-day living, all of us can safely and logically conclude that a possible doubt exists in all things, and that it is almost impossible to possess any human knowledge or come to any conclusion to a certainty beyond a possible doubt. Therefore, the Commonwealth is not required to prove its case beyond all doubt.

\* \* \* \* \* \*

So, to summarize, you may not find the defendant guilty based on mere suspicion, conjecture, or surmise of guilt.

N.T., 11/15/88, at 1381–84 (emphasis appellant's, *see* Appellant's Brief at 61).

We most recently considered an ineffectiveness claim of the type that appellant now raises in *Commonwealth v. (Damon) Jones*, 590 Pa.202, 912 A.2d 268 (2006) (plurality). The jury instruction at issue in *Jones* defined reasonable doubt as "a doubt as would cause a reasonably prudent, careful, and sensible person to pause, hesitate, and restrain himself or herself before acting upon a matter of highest importance in his or her own affairs." *Id.* at 287 (internal quotation marks omitted). Like appellant here, Jones argued that "the addition of the words 'pause' and 'restrain' unconstitutionally reduced the prosecution's burden of proof as it improperly elevated the level of doubt required before a juror would find reasonable doubt." *Id.* at 287. Citing a string of cases in which this Court has consistently approved of reasonable doubt instructions containing the word "restrain," we rejected Jones' underlying allegation of error and therefore denied his ineffectiveness claim. *Id.* at 287–88. Likewise, in *Commonwealth v. Gibson*, 553 Pa. 648, 720 A.2d 473, 481–82 (1998), we rejected the appellant's argument that the trial court's repeated use of the phrase "stop, hesitate and seriously consider" improperly led the jury to believe that reasonable doubt is a doubt that would require the reasonable person to refrain from acting altogether rather than to merely hesitate before acting. *See also Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292, 301–02 (2001) (upholding instruction that "a mere hesitation in and of itself is not a reasonable doubt, but a hesitation ... may become a reasonable doubt when and if that hesitation becomes a restraint"); *Commonwealth v. Pearson*, 450 Pa. 467, 303 A.2d 481, 484–85 (1973) (rejecting appellant's argument that trial court's use of the phrase "halt, hesitate and refuse to take action" indicated necessity for existence of stronger doubt in jurors' minds than law required).

Similarly, this Court has consistently rejected challenges to a trial court's description of reasonable doubt as "much more serious than a possible doubt." *See Commonwealth v.*

*Hughes,* 581 Pa. 274, 865 A.2d 761, 790 (2004); *Commonwealth v. Murphy,* 559 Pa. 71, 739 A.2d 141, 147 (1999) (citing *Commonwealth v. Stokes,* 532 Pa. 242, 615 A.2d 704, 709 (1992) (OAJC)).[25] Moreover, in *Murphy,* we also rejected a challenge based on *Victor v. Nebraska, supra.* The instruction at issue in *Victor* defined reasonable doubt as "an actual and substantial doubt ... as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." *Victor,* 511 U.S. at 18, 114 S.Ct. 1239. Although the *Victor* Court noted that the use of the word "substantial" was "problematic," it ultimately rejected Victor's challenge because the context made clear that the trial court meant substantial as in "not seeming or imaginary" rather than "to a large degree." *Id.* at 19–20, 114 S.Ct. 1239. As this Court noted in *Murphy,* the *Victor* Court further reasoned that, elsewhere in the charge, the trial court had provided an alternative definition of reasonable doubt that cured the putative problem caused by its use of the word "substantial." *Murphy,* 739 A.2d at 148 (citing *Victor,* 511 U.S. at 20, 114 S.Ct. 1239). Therefore, the after-decided *Victor* case does not support appellant's claim that the trial court erred in describing reasonable doubt as "much more serious than a possible doubt." Counsel cannot be faulted for failing to raise a claim that had no support in the law at the time of trial. Even if a court someday were to uphold appellant's preference, that would not make counsel ineffective in 1988 for acting in accordance with governing law. Because there is no arguable merit to his challenge to the trial court's reasonable doubt instruction, appellant is not entitled to relief on this ineffectiveness claim. *See Sneed, supra.*

### F. Failure to object to portions of final jury charge

Appellant next claims that trial counsel was ineffective for failing to object when the trial court "repeatedly intervened in the trial." Appellant's Brief at 7. This claim is essentially a challenge to two portions of the trial court's final instructions

25. Notably, the same trial judge presided in *Hughes, Murphy, Stokes,* and the instant case.

to the jury.[26] First, appellant asserts that trial counsel should have objected when the court improperly "presumed appellant was the perpetrator" when instructing the jury that it could "evaluate the facts about how and what the defendant did before the actual killing, showing he was engaged in activity directed to do the killing." *Id.* at 65 & n. 43 (quoting N.T., 11/15/88, at 1467). Second, appellant contends that trial counsel should have objected when, after the court instructed the jury that it had the option of convicting appellant of voluntary manslaughter, the court stated its "opinion [that] under the facts and circumstances of this case . . . voluntary manslaughter would not be an appropriate verdict." *Id.* at 65 & n. 44 (quoting N.T., 11/15/88, at 1482). Appellant argues that the trial judge thereby "stepped out of his proper role by expressing his personal opinion to the jury." *Id.* at 65–66.

The Commonwealth does not offer a specific response to appellant's allegation that the trial court improperly presumed that appellant was the perpetrator. In response to appellant's reliance on the court's expression of its opinion as to the lack of evidence of voluntary manslaughter, the Commonwealth argues that this Court rejected this exact claim in *Commonwealth v. Cox,* 546 Pa. 515, 686 A.2d 1279 (1997). As in *Cox,* the Commonwealth contends, there was absolutely no evidence in the case *sub judice* to support a conviction for the lesser offense of voluntary manslaughter. Moreover, the Commonwealth notes, the trial court made clear to the jury that it was not bound by the court's opinion. *See* Commonwealth's Brief at 67 (quoting N.T., 11/15/88, at 1481–82).

26. Citing the Factual History section of his Brief in which he quotes excerpts from the notes of testimony, appellant also asserts in a single sentence that "the trial court inserted itself into the trial by interrupting defense counsel's questioning of witnesses, made at least one statement critical of trial counsel, and summarized the testimony of the various witnesses (thus putting the court's imprimatur on their testimony)." Appellant's Brief at 64. Appellant, however, fails to develop any argument that the trial court committed objectionable, much less reversible error in these instances. Because appellant does no more than baldly assert that there is arguable merit to this underlying claim of trial court error, we do not consider these undeveloped allegations in evaluating the instant ineffectiveness claim.

Appellant's first argument is based on a statement that the trial court made in the course of instructing the jury on the offense of first-degree murder. The court instructed the jury that, "in order to find the defendant guilty of first-degree murder, you must find that the killing was a wilful, deliberate, premeditated act." N.T., 11/15/88, at 1461. The court further instructed that the jury could infer that the killing was willful, deliberate, and premeditated "from the killer's use of a deadly weapon upon a vital part of a victim's body." *Id.* at 1466. The court then proceeded to suggest "other **type of evidence** [that] should be considered or is important as to whether or not a killing is willful, deliberate, and premeditated," namely:

[N]umber one, you could evaluate **the facts about** how and what the defendant did before the actual killing, showing he was engaged in activity directed to do the killing. This means planning activity, such as prior possession of a murder weapon, sneaking up on the victim and taking the victim where others will not intrude. Two, **facts about** the defendant's prior association, relations, or conduct with the victim which show motive for the killing. . . . [A]nd three, **the facts and nature of** the killings.

*Id.* at 1467 (emphasis added).

Considered in its full context, the trial court's instruction—that the jury "could evaluate the facts about how and what the defendant did before the actual killing, showing he was engaged in activity directed to do the killing"—did not improperly presume or suggest that appellant was, in fact, guilty of first-degree murder. Rather, in explaining to the jury the "type[s] of evidence" relevant to the determination of whether a killing is willful, deliberate, and premeditated, the court merely specified which particular facts might be pertinent. The court did not direct the jury to apply the facts as portrayed by the Commonwealth at trial. Therefore, there is no arguable merit to appellant's claim that trial counsel was required to object to this statement by the trial court.

Proceeding to the other underlying allegation of error alleged by appellant, we first note that this Court has re-

peatedly held since 1983 that a murder defendant is entitled to a jury instruction on the lesser offense of voluntary manslaughter only where there is sufficient evidence to support such a verdict. *Commonwealth v. Ragan,* 560 Pa. 106, 743 A.2d 390, 396 (1999) (citing, *inter alia, Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328, 1332–33 (1983)). In the instant case, the trial court did instruct the jury that "voluntary manslaughter should be returned by you if you, in your wisdom, decide that is a proper verdict." N.T., 11/15/88, at 1482. Nevertheless, appellant argues that the court erred in telling the jury the court's "opinion [that] under the facts and circumstances of this case ... voluntary manslaughter would not be an appropriate verdict." Appellant's Brief at 65 & n. 44 (quoting N.T., 11/15/88, at 1482).

The full context of the court's statement that "voluntary manslaughter would not be an appropriate verdict" is as follows:

As the presiding judge here, I am about to give an opinion on whether or not the facts supported by the evidence in this case show the defendant committed voluntary manslaughter, in this instance, provocation or passion manslaughter. Clearly understand, you are not bound by the opinion that I am about to express as the trial court judge. You have every right in the world to disregard my opinion that is about to be expressed to you. You are the factfinders. You can return any verdict that you want in this case. You are to consider voluntary manslaughter equally with all of the other verdicts in this case. If you want to return that verdict, it is in your power to do so, and feel free to do so. You are not obligated by my statement of the opinion about to be made to you. You can return a verdict of voluntary manslaughter even if the facts do not show the defendant is guilty of that crime. I am not pushing you; I am not prevailing upon you. But, in any event, it is the opinion of this court that there is little, if any, evidence of the crime of voluntary manslaughter in this case, and my statement to you is an opinion with respect to the evidence which you are

in no manner, way, shape, or form bound to abide by or to comply with and which you are not bound by.

N.T., 11/15/88, at 1481–82.

In *Commonwealth v. Cox, supra,* the appellant claimed that his counsel was ineffective for failing to object when, during its final charge to the jury, the trial court commented that there was insufficient evidence to sustain a verdict of voluntary manslaughter. *Cox,* 686 A.2d at 1291. In discussing Cox's claim, this Court first noted that the trial court "instructed the jurors that the decision was their decision to make and the court's view of the evidence had no controlling effect in 'any way, shape or form.'" *Id.* We further noted that, at trial, Cox presented no evidence either of a sudden and intense passion resulting from serious provocation, *see* 18 Pa.C.S. § 2503(a), or of an unreasonable belief in self-defense, *see* 18 Pa.C.S. § 2503(b). *Cox,* 686 A.2d at 1291. Therefore, we rejected appellant's ineffectiveness claim.

In the instant case, the trial court clearly instructed the jury that it was not bound by the court's opinion as to the lack of evidence to support a voluntary manslaughter verdict. Moreover, appellant did not present any evidence that would support a conviction for voluntary manslaughter instead of murder. In fact, in his closing argument, defense counsel repeatedly asserted that the Commonwealth had not presented any credible evidence of any involvement whatsoever on the part of appellant in Tyler's killing. *See, e.g.,* N.T., 11/15/88, at 1306 ("There's not an inch of physical evidence in this case which would indicate any culpability at all on the part of Robert Cook."); *id.* at 1310 ("The only testimony that you have in this case upon which to base a verdict of guilty as to Robert Cook is testimony from people with motivation to lie...."). Therefore, the trial court did not err in offering its accurate opinion that there was little, if any, evidence of voluntary manslaughter. The court's charge left it open for the jury to return an **unsupported** verdict of voluntary manslaughter, which would have been an unwarranted windfall for appellant. Because there is no arguable merit to either of his challenges to the trial court's final instructions to the jury,

appellant is not entitled to relief on this ineffectiveness claim. *See Sneed, supra.*

## III. Denial of Evidentiary Hearing

Finally, appellant claims that the PCRA court erred in denying an evidentiary hearing on "numerous" ineffectiveness claims. Appellant's Brief at 98. Appellant argues that, by denying a hearing on these unspecified issues, the PCRA court prevented appellant from establishing the absence of a reasonable basis on the part of both trial and appellate counsel for failing to raise these issues. In response, the Commonwealth disputes this claim on the basis that the underlying allegations of trial court error are waived and meritless.

As we have explained above, appellant is not entitled to relief on any of his ineffectiveness claims, regardless of whether prior counsel had a reasonable basis for failing to raise them below. Therefore, further development of the post-conviction record of this case is unwarranted.

## IV. Conclusion

For the foregoing reasons, we affirm the order of the PCRA court.

Justice GREENSPAN did not participate in the consideration or decision of this case.

Justice EAKIN, Justice TODD and Justice McCAFFERY join the opinion.

Justice SAYLOR files a dissenting opinion in which Justice BAER joins.

## *DISSENTING OPINION*

Justice SAYLOR.

This matter falls into a particularly problematic set of criminal cases handled by then-Assistant District Attorney Jack McMahon within a short time after he gave his 1987 jury-selection training session as recorded on the tape at issue. As with *Commonwealth v. Basemore*, 560 Pa. 258, 744

A.2d 717 (2000), Mr. McMahon prosecuted this case in 1988, within approximately one year of the training session. Excerpts of McMahon's comments on the tape are provided in *Basemore. See Basemore,* 560 Pa. at 280–83, 744 A.2d at 730–31. In substance, Mr. McMahon's remarks indicate, among other things, that he does not feel bound by the Constitution as interpreted by appellate courts, and that obtaining a conviction is the highest value that a prosecutor can achieve. The following excerpt is illustrative:

> The case law says that the object of getting a jury is to get—I wrote it down. I looked in the cases. I had to look this up because I didn't know this was the purpose of a jury. "Voir dire is to get a competent, fair, and impartial jury." Well, that's ridiculous. You're not trying to get that. You're—both sides are trying to get the jury most likely to do whatever they want them to do.

> And if you go in there and any one of you think you're going to be some noble civil libertarian and try to get jurors, "well, he says he can be fair; I'll go with him," that's ridiculous. You'll lose and you'll be out of the office; you'll be doing corporate law. Because that's what will happen. You're there to win[.]

*Jury Selection with Jack McMahon,* transcript at 45–46. Consistent with the above, in the training class McMahon indicates, among other things, that: he attempts to obtain a jury that is as "unfair" as possible; in his efforts to secure a conviction-friendly jury, he adheres to a set of jury-selection principles that are, in large part, based on race and gender; [1]

1. For example, he states that "in my experience, black women, young black women are very bad," *id.* at 57; prosecutors should avoid having "older black women" on the jury when the defendant is a young black male because of a possible "maternal instinct" that would cause leniency, whereas men are more "demanding" and "law and order," *id.* at 56; district attorneys should also exclude individuals from an area of Philadelphia near the intersection of 33rd and Diamond Streets, an area known to be predominantly black, *see id.* at 21; N.T. December 11, 2002 at 65 (reflecting McMahon's knowledge of the racial composition of the neighborhood around 33rd and Diamond); and if a district attorney is "sitting down and you're going to take blacks, you want older blacks ... particularly men. Older black men are very good." *Jury Selection with Jack McMahon,* transcript at 55.

in light of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), he asks African American prospective jurors various questions designed to provide him with a pretextual, race-neutral basis for exercising a race-based peremptory strike in the event defense counsel challenges the strike; and he never deviates from these tactics, which he likens to basic rules for playing blackjack in that they should always be followed. Again, the tape also reflects contempt toward appellate decisions interpreting the Constitution and a similar disrespect articulated toward the integrity of the trial process, as manifested in a studied lack of candor toward the trial court.[2]

In my view, this evidence, through McMahon's own words, strongly implicates that he carried his impermissible attitudes, and applied his unconstitutional practices, in trials within a reasonable temporal proximity before and after the making of the tape. While I have no difficulty with the notion that a *Batson* claimant maintains the burden of persuasion, here, I believe that Appellant met and exceeded his burden in this regard, and it therefore fell to the Commonwealth to rebut that case with evidence carrying at least equal strength. *Cf. Alexander v. Louisiana*, 405 U.S. 625, 631–32, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972) ("Once a prima facie case of invidious discrimination is established [in the selection of a grand jury], the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result. The State has not carried this burden in this case; it has not adequately explained the elimination of Negroes during the process of selecting the grand jury that indicted petitioner." (citations omitted)).

**2.** In the training tape McMahon advocates dealing less than truthfully with the trial court in multiple ways. In addition to inventing pretextual justifications for race-based peremptory strikes, he counsels attorneys to make false excuses to avoid afternoon jury panels, *see Jury Selection with Jack McMahon*, transcript at 65, and to invent pretextual reasons to leave the courtroom in order to view the racial composition of the remaining venire panel, *see id.* at 67–68.

In this regard, the present case does not present the more typical scenario in which a defendant has merely met the fairly low threshold of a *Batson*-type *prima facie* case, thus requiring the prosecutor to articulate his race-neutral explanation for preemptory strikes.  *See Batson,* 476 U.S. at 96–97, 106 S.Ct. at 1723.  Rather, this is a more unusual instance in which the PCRA petitioner has advanced the kind of direct evidence of actual, purposeful discrimination envisioned in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and *Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74 (2004).  In *Swain,* the United States Supreme Court indicated that a systematic practice of excluding blacks from jury service violates the Equal Protection Clause.[3]  In this regard, the *Basemore* Court observed that, although *Swain* violations are difficult to prove, "where such violations have been found admissions by the prosecuting attorney have frequently played a prominent role."  *Basemore,* 560 Pa. at 284, 744 A.2d at 732 (citing *Jackson v. Herring,* 42 F.3d 1350, 1357 (11th Cir.1995), and *State v. Washington,* 375 So.2d 1162, 1164 (La.1979)).

Indeed, the approach of channeling temporally proximate, McMahon-prosecuted cases through the typical *Batson* framework is yielding inconsistent results in our courts, as some PCRA judges find it significant that there are some peremptory challenges that McMahon simply cannot explain, and some do not; likewise, some judges attach a high degree of relevance to the fact that McMahon arguably engaged in disparate treatment of African American and Caucasian prospective jurors in a specific case, and some do not.

In *Commonwealth v. Spence,* 561 Pa. 344, 750 A.2d 303 (2000) (*per curiam*), for example, after this Court vacated the denial of PCRA relief and remanded for further proceedings,

---

3.  Although *Swain* referenced a scenario in which all African Americans were excluded from juries, total exclusion is not necessary for a successful *Swain* challenge; rather, systematic discrimination that substantially reduces the number of African Americans on juries will suffice.  *See Commonwealth v. Futch,* 492 Pa. 359, 367 n. 7, 424 A.2d 1231, 1234 n. 7 (1981); *accord Jackson v. Herring,* 42 F.3d 1350, 1357 (11th Cir.1995) (emphasizing that *Swain* "describes an 'extreme' example of illegal conduct, rather than a 'litmus test.' " (quoting *Horton v. Zant,* 941 F.2d 1449, 1454 (11th Cir.1991))).

McMahon offered race-neutral explanations for all of the challenged peremptory strikes. In view of the comments made during the training session, the common pleas judge granted a new trial, as he simply did not believe that a particular African American juror would have been peremptorily stricken if she had had all the same characteristics but had been white. *See Commonwealth v. Spence*, Sept. Term 1986, No. 3311, PCRA Hearing at 2–3 (C.P. Phila. March 22, 2004) ("I don't think Mr. McMahon is a racist, but, of course, when striking people the way he struck in particular one prospective juror, who was a black lady, whose son was on the police force, he was an FBI agent, he was in DEA and all that, no way do I believe that if this prospective juror was Caucasian, would she have been struck by the District Attorney's Office."). Similarly, in the *Basemore* case, the PCRA court (on remand) granted *Batson* relief after finding the prosecutor's race-neutral explanations "insufficient" and observing that he was unable to explain some of the peremptory challenges. In that matter, the court recognized that disparate treatment of similarly situated jurors may indicate that the explanations offered are pretextual, and referenced examples in which McMahon had explained that he used a peremptory challenge against a black prospective juror because the individual was uneducated, or was living with his or her parents, or had been the victim of a crime, but had accepted white jurors with similar characteristics. *See Commonwealth v. Basemore*, March Term 1987 Nos. 1762–65, 2001 WL 36125302 (C.P. Phila. December 19, 2001) (Opinion by Savitt, J., after remand, granting new trial). Here, by contrast, the PCRA judge concluded that no *Batson* violation was proved although McMahon could not articulate a race-neutral reason for three peremptory strikes against African Americans and engaged in disparate treatment of black and white unemployed individuals, as described in more detail infra. In my view, these types of inconsistent results tend to undermine the appearance of fairness and consistency that forms a necessary foundation to the proper functioning of the criminal justice system, particularly as *Batson* violations are an especially damaging form of defect in criminal proceedings. *See Basemore*, 560 Pa. at 287–

88, 744 A.2d at 734 (explaining that *Batson* violations are fundamental deficiencies that undermine the judicial function at its core and, hence, they are not subject to conventional harmless error or prejudice analysis, particularly in a capital case).

Centrally, I believe that McMahon's recorded admissions concerning consistently applied unconstitutional practices and impermissible attitudes toward jury selection raise the question of whether there is any basis to believe that he experienced some change of heart that could have caused him to alter his approach to jury selection between the time he made the tape and the trial in the present case. In his recorded comments, McMahon simply went too far for his remarks to be merely recast or explained away.

In his testimony in the PCRA proceedings, McMahon did not reference any basis to believe that he fundamentally altered his approach to jury selection in the months following the making of the tape; nor did he expressly disavow the policies expressed in the tape. Rather, when confronted with portions of the tape in which he advocated using a racially-based method of demographic profiling, he sought to justify such methodologies—in view of the overarching goal of obtaining a Commonwealth-friendly jury—based on the person's demographic (as opposed to racial) classification and what that classification could indicate regarding his or her attitude toward the police, or in terms of eliminating any possible empathy that a female juror might feel toward a male defendant of the same race. *See* N.T. December 11, 2002 at 88–99. To me, his comments were more in the nature of an attempt to recast or explain away, and there simply is no evidence of the necessary watershed change.

Even under the ordinary *Batson* regime as applied by the majority, I believe that the *Swain*-type backdrop described above is relevant to the *Batson* analysis in the present case. As the United States Supreme Court explained in *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*"Miller–El II "*):

Although the move from *Swain* to *Batson* left a defendant free to challenge the prosecution without having to cast *Swain's* wide net, the net was not entirely consigned to history, for *Batson's* individualized focus came with a weakness of its own owing to its very emphasis on the particular reasons a prosecutor might give. If any facially neutral reason sufficed to answer a *Batson* challenge, then *Batson* would not amount to much more than *Swain*. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence *Batson's* explanation that a defendant may rely on "all relevant circumstances" to raise an inference of purposeful discrimination.

*Id.* at 239–40, 125 S.Ct. at 2325 (citing *Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1723).

As the majority sets forth, when defense counsel challenges a peremptory strike, the *Batson* procedure calls for the prosecutor to advance a race-neutral explanation, which the trial court then assesses for persuasiveness. *See* Majority Opinion, at 602 (quoting *Commonwealth v. Harris*, 572 Pa. 489, 505–07, 817 A.2d 1033, 1042–43 (2002)). The McMahon tape, especially the admission by McMahon that it is his practice to use pretextual race-neutral explanations, tends to undermine the persuasiveness of any race-neutral explanation he provided at the PCRA hearing. Although, as the majority explains, the trial court's determinations concerning persuasiveness are reviewed deferentially, this standard is grounded on that tribunal's ability to view the prosecutor's demeanor first-hand. *See id.* at 603. In this respect, the present case is unusual: it does not fit into the normal *Batson* framework because no contemporaneous justifications were given inasmuch as the *Batson* procedure was invoked many years after trial.[4] Thus, as was

4. Perhaps because the McMahon tape had not yet become public, defense counsel did not forward any *Batson* challenges contemporaneously with the challenged peremptory strikes, but reluctantly raised the issue at the conclusion of jury selection upon Appellant's insistence. The trial court rejected the claim *in toto* without requesting any race-neutral explanations from McMahon.

evident at the PCRA hearing, McMahon had to rely upon the *voir dire* transcript to formulate his race-neutral explanations. *See* N.T. December 11, 2002 at 17. While this in itself is not unique, the point is that the prosecutor's demeanor in responding to a *Batson* challenge is plainly of less significance in such a context than when he provides his reasons at the time of trial while they are still fresh in his mind. *Cf. Miller–El v. Cockrell,* 537 U.S. 322, 343, 123 S.Ct. 1029, 1042–43, 154 L.Ed.2d 931 (2003) (*"Miller–El I"*) (recognizing that explanations offered by a prosecutor at a hearing years after trial are "subject to the usual risks of imprecision and distortion from the passage of time"). Accordingly—and in light of McMahon's admission that it was his regular practice to question African Americans in a manner calculated to develop pretextual race-neutral explanations for a race-based peremptory strike [5]—I believe that this Court is entitled to scrutinize the facial plausibility of McMahon's explanations in a less deferential mode than usual.

As applied presently, I find McMahon's rationale for striking two black jurors who were unemployed, but accepting one white juror who was also unemployed, exceptionally weak. He indicates that he struck prospective juror 328, a black female, because she was a 24–year–old student living with her unemployed mother, it was unclear where the "money [was] coming from," and that these circumstances "rose [sic] the stability factor." *See* N.T. December 11, 2002 at 44. It is not evident, however, why a 24–year–old student may be considered in any respect unusual or unstable. As to prospective juror 203, a black male, McMahon states that he exercised a peremptory strike because the individual had apparently been fired from his job, a circumstance that, again, "goes to the stability factor." However, there is nothing in the *voir dire*

---

5. *See Jury Selection with Jack McMahon,* transcript at 70; *Basemore,* 560 Pa. at 283, 744 A.2d at 731; *cf. Miller–El II,* 545 U.S. at 255–63, 125 S.Ct. at 2333–38 (disapproving prosecutorial questioning of black potential jurors undertaken in an effort to create a pretextual challenge for cause, where the same questioning techniques were not used relative to white venirepersons).

transcript to indicate that he was fired.[6] On the other hand, McMahon accepted, after minimal questioning, a white venire-woman who was unemployed, whose husband had been laid off, and whose daughter was a full-time student, *see* N.T. October 19, 1988 at 135–37 (*voir dire* of prospective juror 357), notwithstanding any "stability" concerns that these circum-stances may have given rise to. Moreover, in the training tape McMahon specifically recommends using lack of employ-ment as a pretextual basis for exercising a race-based peremp-tory strike. *See Jury Selection with Jack McMahon*, tran-script at 70–71. Finally, as discussed, McMahon was unable to explain several peremptory strikes on race-neutral grounds. *See* Majority Opinion, at 606–07.

Presently, as the majority observes, the record shows that McMahon peremptorily struck 58 percent of blacks whom he had an opportunity to strike, versus only 18 percent of whites whom he had an opportunity to strike. *See* Majority Opinion, at 605 n. 8 (noting that the PCRA court defined a venireper-son whom the prosecutor had an opportunity to strike as one who was not excused or stricken for cause, and not stricken by the defense when it was the defense's turn to go first). Additionally, of the nineteen peremptory challenges that McMahon exercised, fourteen (73 percent) were against Afri-can Americans. *Cf. Miller–El I*, 537 U.S. at 342, 123 S.Ct. at 1042 (observing that, where the prosecutor used ten of his fourteen strikes (71 percent) against African Americans, such a result was not likely due to "happenstance"). It is not a convincing answer to say that African Americans served on Appellant's jury and that McMahon did not exhaust all his peremptories: in the videotape, he tailors his racially based jury selection theory to advocate allowing some blacks onto the jury where, as here, the defendant and the eyewitnesses are black. McMahon hypothesizes in this respect that, unless there are a few African Americans in the jury room, the white jurors might be inclined to adopt an apathetic attitude toward

6. The transcript only reveals prospective juror 203 had worked for an employer and no longer worked for that same employer, but that he had not retired.

the crime during deliberations. *See Jury Selection with Jack McMahon*, transcript at 58–59; *see also id.* at 59 ("I've always felt that a jury of like eight whites and four blacks is a great jury, or nine and three, because then you're not going to get any of that [apathy] in there.").

In light of all of these circumstances, I would conclude that the PCRA court's decision to credit McMahon's explanations was clear error and would, accordingly, find that Appellant carried his burden under either *Swain* or *Batson.*

Justice BAER joins this dissenting opinion.