J-A22017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DAWINE PAIH AND STEPHEN L. TOGBA, JR., INDIVIDUALLY AND AS PARENTS AND GUARDIANS OF STEPHEN L. TOGBA, III, A MINOR ON BEHALF OF THEMSELVES INDIVIDUALLY AND ON BEHALF OF STEPHEN L. TOGBA, III, A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ANANDIVOR NORONHA, M.D., A.K.A., A.I. NORONHA, M.D., AND/OR ANANDPRAKASH NORONHA, M.D., AND DELAWARE COUNTY MEMORIAL HOSPITAL, A MEMBER OF CROZER-KEYSTONE HEALTH SYSTEM | |
| Appellee | No. 3584 EDA 2016 |

Appeal from the Order Dated November 15, 2016
In the Court of Common Pleas of Delaware County
Civil Division at No(s): 10-12873

BEFORE:  BOWES, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:　　　　　　**FILED OCTOBER 25, 2017**

Dawine Paih and Stephen L. Tobga, Jr., individually and as parents and guardians of Stephen L. Togba, III, a minor (collectively, "Appellants") (individually, "Paih" or "Baby Togba"), appeal from the order denying their

_____

[*] Retired Senior Judge assigned to the Superior Court.

motion for post-trial relief[1] following a jury verdict in favor of Appellees, Anandivor Noronha, M.D. and Delaware County Memorial Hospital ("DCMH"), in the underlying medical malpractice action. After careful review, we are constrained to affirm.

On June 16, 2008, Paih presented to DCMH in labor. As labor progressed, signs of fetal distress occurred. By the time the delivery team recognized the emergency, they were forced to perform a vacuum extraction of Baby Togba. After delivery, Baby Togba received care at Jefferson University Hospital as a result of hypoxic ischemic encephalopathy, damage to cells in the central nervous system from inadequate oxygen.[2] In 2009, Baby Togba was diagnosed with cerebral palsy secondary to his birth trauma; he has multiple, severe neurologic deficits which may be permanent.

On September 24, 2010, Appellants filed a medical malpractice action asserting that Appellees were negligent in the entire course and care and overall management of the labor and delivery process during the birth of their

_____

[1] Following the denial of post-trial motions, Appellants praecipied to have judgment entered on the jury's defense verdict. **See** Praecipe to Enter Judgment, 12/22/16; **see also** Pa.R.C.P. 227.4 (entry of judgment following verdict of jury).

[2] Hypoxic ischemic encephalopathy can later result in cerebral palsy. **See** http://www.medicinenet.com/script/main/art.asp?articlekey=3875 (last visited on 9/28/17).

son.[3] During jury selection, Appellees used two of their four preemptory challenges to strike the only two African-American jurors on the jury panel. Appellants raised a **Batson**[4] challenge that the court ultimately denied. Following jury selection, Appellants moved to preclude Appellees from eliciting testimony from their expert witness that there is no epidemiological evidence that fetal monitoring has eliminated or reduced the rates of cerebral palsy. The court denied Appellants' motion *in limine*. During trial, Appellants again objected to this testimony, as well as Appellees' cross-examination of their standard of care expert on the issue of global cerebral palsy rates. Both objections were overruled.

Following a one-day jury trial, a defense verdict was returned. Appellants filed timely post-trial motions that the court denied. On November 22, 2016, Appellants filed a timely appeal and court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal. They raise the following issues for our consideration:

> (1) Whether the trial court erred in permitting testimony that there is no epidemiological evidence showing that fetal monitoring has reduced the rates of cerebral palsy in the population as a whole, where the issue in the case was whether the [Appellees] were negligent in managing the

---

[3] Trial originally commenced on April 4, 2014. However, on April 17, 2014, a mistrial was declared following a deadlocked jury. Over two years later the case proceeded to the instant trial.

[4] **Batson v. Kentucky**, 76 U.S. 79 (1986). We note that **Batson** was extended to civil cases. **See Edmonson v. Leesville Concrete Co.**, 500 U.S. 614 (1991) (**Batson** applies in civil case with respect to classifications based on ancestry or skin color).

labor and delivery of one baby, [Appellants'] son, Stephen Togba, III, and where there is no logical connection between statistics purporting to show global rates of cerebral palsy and any material facts in this case.

(2) Whether permitting testimony that there is no epidemiological evidence showing that fetal monitoring has reduced the rates of cerebral palsy in the population as a whole prejudiced the [Appellants] by influencing the jury's no-negligence verdict.

(3) Whether the trial court erred in violation of **Batson v. Kentucky**, 76 U.S. 79[] (1986), and **Edmonson v. Leesville Concrete**, 500 U.S. 614 [] (1991)[,] by denying [Appellants'] motion to empanel Juror #4, where [Appellees] exercised two of their four peremptory challenges to strike the only two African-American members of the venire, and where the reasons given for striking Juror #4 were blatantly pretextual.

Appellants' Brief, at 5.

Appellants first argue that the trial court impermissibly admitted irrelevant testimony from Appellees' expert, Robert Debbs, D.O., and that the probative value of this testimony was substantially outweighed by the danger of unfair prejudice. Specifically, Appellees assert that admission of this evidence served to confuse and mislead the jury by diverting its attention from the real issue in the case – whether Appellees' conduct fell below the standard of care in this matter by: improperly administering Pitocin causing the baby to be deprived of oxygen; failing to communicate properly in the labor and delivery room; and failing to deliver the baby after unsuccessful attempts at intrauterine resuscitation.

"Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court, and an

appellate court may reverse only if it finds an abuse of discretion or error of law." ***Hyrcza v. West Penn Allegheny Health Sys.***, 978 A.2d 961, 972 (Pa. Super. 2009) (citation omitted). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. ***McManamon v. Washko***, 906 A.2d 1259, 1269-70 (Pa. Super. 2006).

Instantly, the trial court determined that there was no error in admitting Dr. Debbs' testimony for two reasons. First, the court noted that this testimony went to causation, and, because the jury did not reach this issue,[5] any alleged error would have been harmless. Second, the court noted that Dr. Debbs also opined on other causation matters, such as testifying that Appellees' management of labor and delivery was within the appropriate standard of care and that Baby Togba's injury could have occurred prior to Paih's admission to the hospital. It is also important to note that, in their amended complaint, Appellants alleged that Appellees' negligence was based, in part, upon "[f]ailing to recognize and respond to the non-reassuring fetal heart tracings [and f]ailing to properly document the fetal heart tracings and notify the physicians of the same." Plaintiffs' Amended Complaint, 11/24/2010, at 6 ¶ 26(i) & (j). Thus, the topic of how fetal monitoring played a part in Appellees' alleged negligent care of Paih and Baby Togba was relevant

---

[5] The verdict slip reflects that the jury answered "no" to whether Appellees' conduct fell below the standard of care in the instant case. Verdict Slip, 7/13/16, at ¶ 1. Accordingly, they never reached the issues of factual cause or damages.

to the case. **See** Expert Report of Robert Debbs, D.O., 10/10/15, at 15 ("[A]s the plaintiffs' experts collectively suggest, one first has to prove that intervening in labor and delivery based solely on fetal heart rate patterns, can actually prevent cerebral palsy."); **see also** Pa.R.E. 401 (relevancy).

However, even if the evidence were deemed to be irrelevant, we would not conclude that its probative value was outweighed by unfair prejudice. **See** Pa.R.E. 403 (court may exclude relevant evidence if probative value is outweighed by danger of unfair prejudice, confusing issues, misleading jury, undue delay, wasting time, or needlessly presenting cumulative evidence); **id.** comment (unfair prejudice means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty to weighing the evidence impartially). Doctor Debbs testified about other medical findings specific to Baby Togba that could have caused his injuries and, accordingly, could have resulted in a no-negligence verdict. **See** N.T. Jury Trial, 7/1/16, at 11-12 (Debbs testifying to inflammatory cells destroying blood vessels in brain causing lack of oxygen to brain and, ultimately, brain damage); **id.** at 12 (meconium passage is sign of fetal stress predating Paih's admission to hospital); **id.** at 14 (hypoxic brain injury can often occur within 24 hours of admission to hospital before birth, then show recovery, and then deteriorate) **id.** at 14-15 (findings in Baby Togba's placenta, suggesting causation factors which predated Paih's admission to hospital, often lead to infections and inflammations and, possibly, brain injury). Finally, because Appellants were

permitted to rebut Dr. Debbs' testimony, as well as cross-examine him on the issue, the risk of unfair prejudice was mitigated.

Appellants next argue that it was error to permit Appellees to cross-examine their expert, Dr. Hankins, on articles[6] he had written that concerned the same issue, whether fetal monitoring had reduced the rates of cerebral palsy in the general population. In addition, Appellants claim that the trial court improperly precluded them from redirect examination of Dr. Hankins on the issue of causation, after Appellees had extensively cross-examined him on the fetal monitoring issue.

It is well established that an expert witness may be cross-examined on the contents of a publication upon which he or she has relied in forming an opinion and on other publications the expert acknowledges to be standard works in the field. *Majdic v. Cincinnati Machine Co.*, 537 A.2d 334, 339 (Pa. Super. 1988). Notably, the publication or article is not admitted for the truth of the matter asserted, but only to challenge the credibility of the witness' opinion and the weight to be accorded thereto. *Id.*

_____

[6] In Dr. Debbs' expert report, he noted that Dr. Hankins was "a frequent contributor [to] medical literature [and] has repeatedly endorsed the following statement: No policy or intervention has been shown to reduce the risk of cerebral palsy in late pregnancy. The rate of cerebral palsy . . . has remained constant over the last 40 years despite a quadrupling of caesarean section rates, the introduction of electronic fetal minoring and better obstetric and neonatal care." Expert Report of Robert Debbs, D.O., 10/10/15, at 15-16, citing Gary D. V. Hankins, *Only an Expert Witness can Prevent Cerebral Palsy: The Future of Childbirth* (2006).

Here, the court properly permitted Appellees to cross-examine Dr. Hankins on literature he had authored that not only discussed possible causes of cerebral palsy, but also explained that the increase in caesarean sections had not decreased the rate of cerebral palsy births and that cerebral palsy has not been proven to be preventable by delivering a baby in the earlier stages of labor. N.T. Jury Trial, 6/28/16, at 197-203; *id.* at 203 (""Cerebral palsy due to birth asphyxia has been shown to rarely be preventable. That is true."). Both of these issues challenged Dr. Hankins' credibility and the weight to be given his testimony on the issue of Appellees' negligence in the instant case. Contrary to the Appellees' defense, Dr. Hankins' expert report specifically opined that the cause of Baby Togba's injuries was not from an injury sustained prior to hospital admission, but rather the "interpretation of the fetal monitoring, failure to timely deliver and use of oxytocin." Expert Report of Gary Hankins, M.D., 9/8/15, at 3. Under such circumstances, we cannot find the use of articles and publications authored by Dr. Hankins to be an abuse of the trial court's discretion or an error of law. **Hyrcza**, **supra**.

With regard to the prejudicial nature of the titles of the publications and articles,[7] we similarly find no abuse of discretion. Again, the challenged evidence was a fair response to Appellants' theory of liability. Moreover, to prevent the defense from using articles published by the Appellants' own

---

[7] Those titles were "Who Will Deliver our Grandchildren," "Implications of Cerebral Palsy Litigation," and "Obstetric Litigation is Asphyxiating our Maternity Service."

expert would fly in the face of fairness. Finally, Dr. Hankins was permitted to fully explain the articles and any change of opinion he had formed as it related to the instant case. *See* N.T. Jury Trial, 6/23/16, at 82 ("[A]re you suggesting that your opinions as to the cause of cerebral palsy have changed over the years? They have."); *id.* at 84 ("And you're telling us that your - - the opinions that you've put in these papers . . . have now changed, sir? Certainly they've changed across time. Yes, sir.").

Appellants next complain that the trial court precluded them from asking Dr. Hankins, on redirect examination, if he "ha[d] an opinion that you can express, with reasonable medical certainty, whether [cerebral palsy] could have been prevented under the facts of this case as you know them?" N.T. Jury Trial, 6/23/16, at 259. Appellants assert that Appellees opened the door to the issue of causation on cross-examination and, as a result, they should have been able to pursue this line of questioning on redirect examination.

"It is the function of redirect examination to explain, enlarge upon, or qualify new matter brought out by cross-examination, so that the jury will not receive distorted impression of facts from such testimony." *Commonwealth v. Kauffman*, 38 A.2d 425, 428 (Pa. Super. 1944). The scope of redirect examination is largely within the discretion of a trial court. *Commonwealth v. Dreibelbis*, 426 A.2d 1111 (Pa. 1981). "[W]hen a trial court indicates the reason for its decision, an appellate court's scope of review is limited to an examination of the stated reason." *Commonwealth v. Davis*, 17 A.3d 390, 395 (Pa. Super. 2011) (quotation and citations omitted).

- 9 -

Here, Appellees did ask Dr. Hankins, "[s]o you would agree that in this case this cerebral palsy could have been a developmental event that was unpreventable, as you have indicated in your publications?" N.T. Jury Trial, 6/23/16, at 234. However, Dr. Hankins answered that if there was neurological evidence to support that, he was "not an expert to refute it." *Id.* He also stated that his testimony about pre-labor and delivery conditions that may cause cerebral palsy was made in relation to global incidents, not the instant case. *See id.* ("And I'm talking globally, not in this case."). Since the specific issue regarding whether cerebral palsy could have been prevented in this particular case was not brought out on cross-examination, the court did not abuse its discretion in restricting Appellants' redirect examination to that which was raised in the cross-examination. *Kauffman*, *supra*; *Dreibelbis*, *supra*.

Appellants last claim that the trial court improperly denied their motion to empanel Juror #4 where Appellees used two of their four peremptory challenges to strike the only African-American jurors on the panel. Appellants specifically allege that Appellees improperly struck these jurors upon purposefully discriminatory grounds, offering no persuasive or facially neutral explanation to support the challenges.

Appellants' issue alleges a violation of the United State Supreme Court's decision in *Batson*, *supra*, which held that "the Equal Protection Clause forbids [a] prosecutor to challenge potential jurors solely on account of their race." *Id.* at 89.

To show a **Batson** violation, an appellant must generally demonstrate his particular factual situation satisfies the well[-]established test laid out by the United States Supreme Court's opinion in that case: First, the [movant] must make a *prima facie* showing that the [opposing party] has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the [opposing party] to articulate a race-neutral explanation for his peremptory challenges. Finally, the trial court must determine whether the [movant] has carried his burden of proving purposeful discrimination.

*Commonwealth v. Simpson*, 66 A.3d 253, 261 (Pa. 2013). To establish a *prima facie* case of purposeful discrimination, the movant must show "that he [i]s a member of a cognizable racial group, that the [opposing party] exercised a preemptory challenge or challenges to remove from the venire members of the [movant's] race; and that the other relevant circumstances combine[] to raise an inference that the [opposing party] removed the juror for racial reasons." *Batson*, 476 U.S. at 96.

The first prong of the **Batson** analysis is not at issue here; Appellants are African-American and Juror #4 is African-American. With regard to the second prong, Appellees explained that they challenged Juror #4 because they knew that the juror would hear the word "meconium" several times during trial, as it was at issue in the case, and that meconium is the substance that his niece had on her face, posing a significant danger at birth. Ultimately, Appellees believed that Juror #4 would likely be "unfairly sympathetic to [Appellants]." Appellees' Brief, at 10.

To justify their decision to strike Juror #4 during voir dire, Appellees further explained:

We also struck juror #4 in today's panel, who is [M.H], again race had nothing to do with our decision to strike him. His entire family had been treated at Delaware County Memorial Hospital. And he described the situation with his sister who delivered I believe two children at Delaware County Memorial Hospital, one of whom was coated in fluid, as he described at the time. And there were concerns, as I took it, of aspiration at the time that sounded very acute and very concerning, even though nothing happened to the child. In this case something allegedly happened to the child, Stephen Togba, III, and I thought that he is going to be drawing a comparison between his sister's children at Delaware County Memorial Hospital and the fact that his sister's children had at least one issue with regard to those children but did not have a problem. It had nothing to do with race. That situation concerned me and was the basis of my decision to trike [M.H.], juror #4, from today's panel.

\*     \*     \*

[Juror #4] described the baby as coming out covered with fluid. He described a concern about ingestion into the lungs. My concern is that the contrast would be made that this baby had concerns during the course of labor but came out problematic and that that would be drawn as a comparison to award damages here.

\*     \*     \*

He explained the situation. I'm defending the very department that is involved in that experience. This is his sister. There's every reason for me to be – even if he's not labeling it as a negative, it's close enough for me to exercise my right, my duty to protect my clients from a juror who has had a potentially negative experience with regard to being coated in meconium and potentially aspirating that.

\*     \*     \*

There's meconium in this case.

N.T. Jury Trial, 6/22/16, at 170, 177, 180-81.

Once Appellees have offered a race-neutral explanation for their challenge, the trial court must then determine whether Appellants have

- 12 -

proven their burden of purposeful discrimination; persuasiveness of the facially-neutral explanation offered by the Appellees is relevant to that inquiry. **Commonwealth v. Harris**, 817 A.2d 1033 (Pa. 2002).

Instantly, the trial court determined that Appellees provided "sufficiently neutral justification for exercising [their] peremptory challenges" where Appellees acknowledged that "each of the jurors in question had been personally affected by experiences directly related to the issues in this case." Trial Court Opinion, 1/23/17, at 12-13. Juror #4 "was stricken because [he] had a relative who had delivery involving meconium staining and the issue of meconium staining was a significant issue in the case." **Id.** at 13. Under such circumstances, the court found that Appellees' reason for striking Juror #4 was sufficiently race-neutral. **See Batson**, **supra** at 98, 98 n.20 (to fulfill obligation to rebut prima facie case of discrimination in jury selection, Appellees' explanation of race-neutral reason must be "clear and reasonably specific" as well as "related to the particular case to be tried.").

A trial court's decision on the ultimate question of discriminatory intent represents a finding of fact that is accorded great deference on appeal and will not be overturned unless clearly erroneous. **Commonwealth v. Cook**, 952 A.2d 594 (Pa. 2008).

> Such great deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations. There will seldom be much evidence bearing on the decisive question of whether counsel's race-neutral explanation for a peremptory challenge should be believed. The best evidence often will be the demeanor of the attorney who exercises the

challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

*Id.* at 603. Moreover, unless a discriminatory intent is inherent in the Appellees' explanation, the reason offered will be deemed race-neutral. *Purkett v. Elem*, 514 U.S. 765 (1995).

Here, Appellees offered a legitimate, race-neutral explanation for striking Juror #4 from the panel. Meconium complicated Juror #4's niece's delivery in the very department of the same hospital where Appellants' child was delivered.[8] Most notably, however, was the fact that meconium was an issue in the instant case. Under such circumstances, we cannot deem the trial court's decision to deny Appellants' *Batson* challenge as clearly erroneous; there was no discriminatory intent inherent in Appellees' reasonable explanation. *Cook*, *supra*.

Order affirmed.

---

[8] Despite the fact that several other potential jurors had complicated deliveries and children born with significant medical/physical issues, even with cerebral palsy, none of these births occurred in Appellee Hospital in the exact department where Baby Togba was born.

- 14 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/25/2017